951 A.2d 1000

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT AND CROSS–RESPONDENT, v, SHARIFF INGRAM, DEFEN-DANT–RESPONDENT AND CROSS–APPELLANT.

Argued May 5, 2008—Decided July 21, 2008.

*Simon Louis Rosenbach*, Assistant Prosecutor, argued the cause for appellant and cross-respondent (*Bruce J. Kaplan*, Middlesex County Prosecutor, attorney).

*Daniel V. Gautieri*, Assistant Deputy Public Defender, argued the cause for respondent and cross-appellant (*Yvonne Smith Segars*, Public Defender, attorney).

Justice RIVERA–SOTO delivered the opinion of the Court.

This appeal presents three questions for disposition. First, we address whether, in those instances in which lesser-included offenses are already charged in the indictment, a trial court nevertheless must instruct the jury that accomplices may have a different state of mind than principals and, thus, may be liable only for the lesser-included offenses. Second, we determine whether the prosecutor misstated the applicability of the statutory affirmative defense to felony murder. Finally, we consider whether, when a defendant voluntarily absents himself from trial, it is error for the trial court to instruct the jury that the defendant's absence, standing alone, may be considered evidence of consciousness of guilt.

We conclude that, when a defendant is charged as an accomplice and lesser-included offenses already are charged in an indictment, the trial court comprehensively must charge the jury on the elements both of the lesser-included crimes and of accomplice liability. We emphasize that a trial court nevertheless separately

should charge the jury that when a principal and an accomplice are charged with the same crime, they may possess differing mental states and, hence, different levels of culpability. Nevertheless, in the circumstances presented here, we find no reversible error in the failure to so separately charge the jury. We further conclude that, in the circumstances presented, the prosecutor did not misstate the applicability of the statutory affirmative defense to felony murder. Finally, we conclude that, in these circumstances, it was error for the trial court to instruct the jury that the defendant's voluntary absence from the trial could be construed by the jury as evidence of consciousness of guilt, and that such error mandates a new trial.

I.

Because the challenges in this appeal are limited to the propriety of the State's summation or the legal sufficiency of the jury charge, the specific facts giving rise to this appeal, in large measure, do not inform the issues presented. However, for context, we note the following abbreviated version of the facts, followed by a more robust presentation of the portions of the State's summation and the trial court's jury charge at issue.

On February 15, 2000, defendant Shariff Ingram drove two of his co-defendants, Lynn Anthony Smith and Christopher Moore, to the Woodbridge Mall; Salaam Brown separately drove his own car, carrying two women passengers, Fatima Harris and co-defendant Jasminé Hampton. Once there, Smith, Moore and defendant entered the mall. When they returned to their car, Brown stated that he needed to go to the apartments located across the street to pick up some money. Both cars drove to the apartment complex, and all of the occupants exited their cars and entered the apartment building en route to the apartment of Sean Taylor, a known drug dealer. They traveled in two groups: the women, Harris and Hampton, entered the apartment building in the company of Corey Maddox, a returning occupant of the apartment, while the four men—Brown, Moore, Smith and defen-

dant—later gained access to the building by following on the heels of someone else who rightfully had access.

By the time the four men arrived at Taylor's apartment, they had covered their faces, and Brown and Moore openly were carrying firearms. Present in the living room of Taylor's apartment was Maddox, along with Harris and Hampton; Appolon Noel, a sound engineer who worked with Taylor, was in one of the bedrooms looking for a music recording and Jihad North also was in a bedroom.[1] At gunpoint, Moore and Smith ordered Maddox to lie down on the floor. Either Moore or Smith found Noel in a bedroom, ordered him to join Maddox on the living room, and bound him with speaker wire. Moore and Smith then asked where the money was; Maddox claimed there was no money on the premises. Moore and Smith went into another bedroom, found North, and ordered him to lie face down on the bed. While in that bedroom, Moore opened a closet, discovered a safe and carried it back into the living room. Brown and Smith then took the safe out of the apartment and placed it in the trunk of Brown's car. Defendant, who had left the apartment by the time Brown and Smith walked out carrying the safe, was sitting in his car; Harris and Hampton were standing next to Brown's car. Smith joined defendant in his car. Throughout, Noel, with his eyes tightly shut, lay face down on the living room floor, near Maddox.

Brown returned to the apartment, where Moore had remained. Shortly after Brown returned to the apartment, Noel heard a gunshot, followed first by quiet, then by a rush of air, and finally a sound he later described as Maddox's gasps. Brown returned to his car. He, Harris and Hampton left in Brown's car, while defendant, Moore and Smith left in defendant's car. In time, Noel was able to untie himself and, once free, he saw Maddox lying on the floor with a gunshot wound to his head. He telephoned Taylor, explained what had occurred, and wrapped a towel around

[1] Both Taylor and Samad North, Jihad North's twin brother who also had been there, had left the apartment earlier and not yet returned.

Maddox's head. Someone other than Noel called for emergency assistance and the police, and later an ambulance, responded. Maddox was taken to the hospital, but died the next day.

Later that day, Brown gave Smith eight hundred dollars, defendant some four or five hundred dollars, Hampton seven hundred dollars, and Harris one thousand dollars. A few days later, Brown also gave Smith a leather jacket with five hundred dollars in one of the inside pockets. When Smith learned that someone was killed during the robbery, he confronted Brown and Moore. Brown responded, "yeah, we did it. I have nothing to lose. I got to pay for these lawyers. I'm not going back to jail—you know." Moore too stated that "nothing we could do about it now, we did what we do so f* *k it, you know what I mean."

In time, police investigators focused, among others, on defendant. On April 20, 2000, defendant provided an oral statement to the investigators. As summarized by the Appellate Division, he stated that

he was twenty-nine years of age at the time of these events and was living in Newark. Defendant stated that he knew Brown because he was a cousin of his girlfriend. On the day of the shooting, Brown asked defendant's assistance in picking up some money in Woodbridge. Defendant consequently led Brown to the Woodbridge Mall in his girlfriend's burgundy Saturn automobile. Brown followed in his grey Mercedes. Defendant noticed that there were two women in the Mercedes back seat. After spending some time at the mall, defendant and Brown left, and then drove across the street into an apartment complex to collect Brown's money.

The door to the apartment was left open for them [and he claimed] that he was the last one up the stairs. According to defendant, he never actually went into the apartment because when he looked into the apartment he saw people with rags covering their faces. Instead of entering, he went back downstairs to his car. He started it up, and talked to one of the girls outside for about five minutes before the other girl came downstairs as well. About twelve minutes later, the other men came out.

Moore then got into defendant's car. Defendant also saw Brown with the safe, which defendant perceived as white and about eighteen inches square. Defendant then attempted to follow Brown's car back to Newark, but failed to keep up with him because Brown was driving erratically.

In his statement, defendant contended that he had been unaware that anyone had been injured at the apartment. Defendant acknowledged that Brown paid him $400 or $500, which he assumed was for the favor of going with him to Woodbridge.

Defendant had only seen Brown around a few times after the incident. He asserted that he did not know about the death of Maddox until the day of his interview by the prosecutor's office.

Approximately four months after these events, the Middlesex County grand jury returned an eight-count indictment, charging defendant, Moore, Smith and Hampton[2] each with one count of second-degree conspiracy, in violation of *N.J.S.A.* 2C:5-2; three counts of second-degree robbery (one for each victim: Maddox, Noel and North), in violation of *N.J.S.A.* 2C:15-1; one count of third-degree burglary, in violation of *N.J.S.A.* 2C:18-2;[3] one count of first-degree felony murder, in violation of *N.J.S.A.* 2C:11-3(a)(3); one count of third-degree theft, in violation of *N.J.S.A.* 2C:20-3; and one count of third-degree possession of a weapon for an unlawful purpose, in violation of *N.J.S.A.* 2C:39-4(a).

On October 21, 2002, the trial court held a status conference in the case prior to jury selection, which was scheduled for two days later. Defendant was present at those proceedings and was informed by the trial court that Smith had pled guilty and would testify at the upcoming trial.[4] Although he was on record notice of the trial start-date, defendant failed to appear for jury selection on October 23, 2002. Inquiries disclosed that there was a pending bench warrant for defendant's arrest as a result of his failure to appear for proceedings in Essex County. The trial court ordered that counsel seek to locate defendant and trial was started—in

---

[2] Brown, in turn, was murdered within two weeks of Maddox's murder. Harris, who at the time was pregnant with Brown's child, was never charged for her role in these events.

[3] Although the charging language in the indictment corresponds to burglary in the second degree, the indictment incorrectly designated the burglary count as a third-degree crime. The parties agreed that the designation in the indictment in respect of the burglary charge was incorrect and that the proper grading for that charge was as a second-degree offense. The parties eventually agreed that the jury would be charged in respect of burglary as a third-degree—and not a second-degree—offense.

[4] Hampton also pled guilty.

defendant's absence [5]—against the two remaining defendants: Moore and defendant. Because defendant was not present, the trial court initially instructed the jury that it was not to consider defendant's absence as probative of any fact or issue.[6]

On October 29, 2002, at the close of the proofs, the State moved to dismiss the weapons charge against defendant. At defendant's request, the trial court dismissed the robbery counts charging the separate robberies of Noel and North, and the burglary count pending against defendant;[7] the robbery count charging the robbery of Maddox was submitted to the jury. Thus, in respect of defendant, the jury was left to deliberate only on one count each for conspiracy to commit robbery, robbery, felony murder and theft. Prior to instructing the jury, however, the trial court

---

[5] *Rule* 3:16(b) provides that "[t]he defendant shall be present at every stage of the trial" unless he waives that right and that "[a] waiver may be found ... from ... the defendant's conduct evidencing a knowing, voluntary, and unjustified absence after ... the defendant has received actual notice in court[.]"

[6] During the direct examination of the State's first witness, the jury sent a note to the trial court referencing defendant's absence and inquiring "where is the other defendant? Will he appear?" After a colloquy with counsel, the trial court instructed the jury that

the only instruction that I can give you is that you should not speculate regarding any reasons for the absence of [defendant]. What you must do is simply listen to the testimony in this case, consider the evidence in this case as it relates to both [defendant] and Mr. Moore, and not engage in any speculation or allow the absence of [defendant] at this time to cause you to draw any conclusions or for that matter to cause you to engage in any discussions about the case.

.... At the end of the case I will give you final instructions regarding all of the legal principles that will govern your deliberations, and I will also at that time address this question more fully. But I can not do so at this time. But I again must stress, you should not speculate or in any way begin to discuss anything about this case including the absence of [defendant]. You should just listen to the evidence and consider it as it relates individually to [defendant] and to Mr. Moore.

[7] The State also had moved to downgrade the burglary charge to a third-degree offense; the trial court's dismissal of that count rendered that application moot.

determined that a flight charge was appropriate because, in the trial court's view, it was "satisfied that if one voluntarily walks away from a trial[,] it is fair and proper for a jury to be instructed that they may draw an inference of consciousness of guilt."

Based on that reasoning, the State made the following reference in its summation concerning defendant's absence:

Now, when it comes to inferences of guilt[,] I want you to think about this one. You have of course been told, you heard Investigator Gerndt as the last witness testify that [defendant] was right here on the 21st right before jury selection, And you of course know that [defendant] has not been present in this case. Now, why has [defendant] skipped? Is it because he's innocent? The Judge is going to give you a charge on flight from trial. He's going to tell you that you may consider the evidence, the defendant's absence, and of course that's specifically what ... Investigator Gerndt testified to. And if you believe that evidence to be credible, I still don't see [defendant], you may infer a consciousness of guilt with.respect to the charges levied against [defendant] in the indictment. That will be the Judge's charge.

Here, take a look at him. There he is. (Indicating.) [Defendant], a man on the run. He's not here in court. He's fleeing from this prosecution because he is afraid of your verdict. I ask that you consider that, his flight, as substantive evidence in conjunction with his Honor's charge on consciousness of guilt. You will get the flight charge.

■ In respect of the felony murder charge, the prosecutor argued to the jury that

when it comes to your analysis of these facts, understand that an accomplice to a robbery can also be found guilty of felony murder. And I'm saying that to you specifically to point out the distinction between [defendant] and ... Moore. There's really no substantial evidence to suggest [defendant] is one of the gunmen inside the apartment. He, nevertheless, was an accomplice.

After discussing the concept of accomplice liability,[8] the State addressed the "mention made by [defendant's counsel] about the statutory defense, the affirmative defense to felony murder." The prosecutor argued that "[y]ou need four elements for this defense to stick." After addressing the first two elements of that statuto-

---

[8] The *Code of Criminal Justice* defines an "accomplice" as part of its general principles of liability. *N.J.S.A.* 2C:2–6(c) and (e). Generally, "for a defendant to be guilty as an accomplice, he or she must (a) possess the culpability required for the substantive crime, and (b) actually foresee and intend the result of his or her act." *State v. Torres*, 183 *N.J.* 554, 556, 874 *A.2d* 1084 (2005) (citation omitted).

ry affirmative defense, the State focused on the third element—
"[t]hat the defendant had no reasonable ground to believe that any
other participant was armed[.]" The prosecutor emphasized de-
fendant's own statement, noting that "[i]f you take [defendant's]
words literally, which were repeated here by [defendant's counsel],
as soon as he got to the door [defendant] saw what was going on."
The State then asked rhetorically "[h]ow could [defendant] now
say that this defense applies to him because he has to know that
others are armed?" The prosecutor underscored the point, re-
marking that "[t]his was done in wide open view of anybody inside
that apartment[,] this robbery, this armed robbery."

Turning to the fourth and "final necessary element to this
defense[—] that the defendant had no reasonable ground to
believe that any other participant intended to engage in conduct
likely to result in death or serious physical injury"—the State
argued to the jury that

> the question for you on this is, well, how would you not know that if you got all
> these gunmen coming into an apartment? They're not going in there with squirt
> guns.... [T]here's no doubt about the fact that if you're an innocent bystander, so
> to speak, to this felony robbery you're not going to [figure] out that there's going to
> be some serious bodily injury coming out of the muzzle of those guns.

As the prosecutor prepared to transition to another subject in
summation, the trial court, on its own motion, interrupted, stating

> I really don't want to get off that last subject without stating, members of the jury,
> that [the prosecutor] has included in his summation the elements of the statutory
> defense or affirmative defense to [the] felony murder rule, but what he has not said
> and which I want to say to you now before we get off the subject is that the State
> has—once the defense is raised the State has [the] burden to disprove one of those
> elements beyond a reasonable doubt. And it's always the State's burden to do so.
>
> Go ahead, Mr. [prosecutor].

The State immediately shouldered that burden, stating that it did
"not run away from [its] burden in this case [but that] the burden
on negating the defense is met by the very evidence [the jury had]
heard [that] establishes that the defense does not apply. Remem-
ber that."

Consistent with its earlier conclusion in respect of the propriety
of a flight charge when a defendant voluntarily absents himself

from a trial—upon which the State, in part, had based its summation to the jury—the trial court then charged the jury as follows:

> Now, with respect to [defendant], the State alleges that [he] purposely failed to appear at this trial in order to avoid conviction. The question of whether [defendant] purposely failed to appear at this trial in order to avoid conviction is another question of fact for you to determine. You should understand that mere absence from a trial doesn't in and of itself establish that the defendant purposely failed to appear in order to avoid conviction. If you find that the defendant, fearing that he would be convicted of the charges contained in the indictment, purposely failed to appear at this trial, then you may consider whether his failure to appear together with all the other evidence in this case is an indication or any proof of his consciousness of guilt. But keep in mind that failure to appear may only be considered as evidence of consciousness of guilt if you determine that the defendant's purpose in failing to appear was to avoid conviction for the offenses charged in the indictment and not for any other purpose. It is for you to decide whether or not the evidence of failure to appear shows a consciousness of guilt and the weight to be given to such evidence in light of all the other evidence in the case.

After two days of deliberations, the jury returned guilty verdicts against defendant on all counts then pending against him: one count each of second-degree conspiracy to commit robbery, second-degree robbery, first-degree felony murder, and third-degree theft.[9] Based on those convictions, the trial court issued a bench warrant for defendant's arrest. Defendant was arrested in Pennsylvania approximately one week later, where he again tried to flee. This time, however, defendant was unsuccessful: he was shot and captured. He ultimately pled guilty to fleeing and eluding in Pennsylvania. On October 31, 2003, defendant's motion for a judgment of acquittal or for a new trial was denied, and he was sentenced to thirty years imprisonment, with a thirty-year term of parole ineligibility.

Defendant appealed and, in an unpublished decision, the Appellate Division vacated defendant's convictions and sentence and remanded the cause for a new trial. Focusing largely on defendant's claim that the jury had been improperly instructed concerning lesser-included offense culpability by accomplices, the panel concluded that "the jury instructions on issues of accomplice

---

[9] The jury acquitted Moore of all charges.

liability did not adhere to the requirements of *State v. Bielkiewicz*, 267 *N.J.Super.* 520, 632 *A.2d* 277 (App.Div.1993)." Specifically, acknowledging that "[t]he court's jury instruction did track the first Model Jury Charge for accomplice liability[,]" the panel nevertheless concluded that the jury instructions "did not provide the supplemental instructions included in the second accomplice liability charge designed for lesser[-]included offenses" which "was specifically designed 'to address circumstances similar to those in *State v. Bielkiewicz*[.]' " (quoting *Model Jury Charge Criminal*, "Liability for Another's Conduct/Accomplice ( [w]here defendant is charged as accomplice and jury is instructed as to lesser[-]included charges)" n. 1 (May 22, 1995)). Although defendant failed to object to the charge as given, the panel nevertheless concluded that "the omission [of a charge concerning accomplice liability for lesser-included offenses] transgressed the holding of *Bielkiewicz*, and had the clear capacity to produce an unjust result." Finally, it explained that "[b]ecause [it] ha[d] remanded this case for a new trial on the accomplice liability issue, [it] need not reach the other issues presented on appeal."

We granted the State's petition for certification and defendant's cross-petition for certification. 192 *N.J.* 598, 934 *A.2d* 639 (2007). For the reasons that follow, we affirm in part and reverse in part the judgment of the Appellate Division.

## II.

According to the State, the Appellate Division erred in determining that, under *Bielkiewicz*, "a trial judge must instruct the jury ... that accomplices may have a different state of mind than principals, and thus may be guilty of committing lesser[-included] offenses, when those lesser[-included] offenses are already charged in the indictment and are therefore before the jury for consideration[.]" The State also asserts that there was no error in the prosecutor's summation and that, in the circumstances presented, the trial court properly charged that the jury could infer

defendant's consciousness of guilt from his voluntary absence at the trial.

Defendant contends that the Appellate Division correctly concluded that the jury instruction in respect of accomplice liability was fatally deficient because it failed to explain that an accomplice can act with a lesser mental state than a principal and, hence, can be held liable only for a lesser-included offense and not the greater, charged offense. He also asserts that, as a matter of plain error, the State "misrepresented the legal defense to felony murder, and the court erred in failing to correct the prosecutor's misstatements." Finally, he questions whether "[t]he trial court erred in providing jurors with a flight charge when [defendant] did not appear at trial because the prejudicial effect of that charge outweighed any probative value that [defendant]'s absence may have had[.]"

### III.

### A.

We address first the question presented on the State's petition for certification: whether the Appellate Division erred in determining that, in the circumstances of this case, the trial court should have charged the jury in accordance with the mandate of *Bielkiewicz.*

*Bielkiewicz* holds that "when a prosecution is based on the theory that a defendant acted as an accomplice, the court is obligated to provide the jury with accurate and understandable jury instructions regarding accomplice liability even without a request by defense counsel." *Supra,* 267 *N.J.Super.* at 527, 632 *A.*2d 277 (citing *State v. Weeks,* 107 *N.J.* 396, 410, 526 *A.*2d 1077 (1987)). It further noted that "when an alleged accomplice is charged with a different degree offense than the principal or lesser[-]included offenses are submitted to the jury, the court has an obligation to carefully impart to the jury the distinctions between the specific intent required for the grades of the offense."

*Id.* at 528, 632 *A.2d* 277 (citation, internal quotation marks and editing marks omitted). We have adopted, with approval, *Bielkiewicz's* analysis. *State v. Savage*, 172 *N.J.* 374, 388, 799 *A.2d* 477 (2002); *State v. Rumblin*, 166 *N.J.* 550, 556, 766 *A.2d* 1141 (2001); *State v. Norman*, 151 *N.J.* 5, 37, 697 *A.2d* 511 (1997) (explaining that, under *Bielkiewicz*, "jury instructions on accomplice liability must include an instruction that a defendant can be found guilty as an accomplice of a lesser[-]included offense even though the principal is found guilty of the more serious offense").

■ Here defendant was convicted of conspiracy to commit robbery, robbery, felony murder, and theft. Of these, two are uniquely unsuited for lesser-included offense analysis: because they required either direct or indirect liability for robbery as a condition precedent for culpability, the conspiracy to commit robbery and felony murder counts would not have been susceptible to a lesser-included offense instruction. We have explained that "[w]hether an offense is an included offense of another charge requires a comparison of the statutory elements of each charge." *State v. Thomas*, 187 *N.J.* 119, 129, 900 *A.2d* 797 (2006). We have noted that

> "[a]n offense will be considered a lesser[-]included offense in several circumstances. One is where the proof required to establish a greater offense is also sufficient to establish every element of a lesser offense. Another is where two offenses are the same but a lesser degree of culpability is required to establish the lesser offense."
>
> [*Id.* at 129–30, 900 *A.2d* 797 (quoting *State v. Muniz*, 228 *N.J.Super.* 492, 496, 550 *A.2d* 487 (App.Div.1988), *rev'd on other grounds*, 118 *N.J.* 319, 571 *A.2d* 948 (1990)).]

In that analysis, then, proof of either conspiracy to commit robbery or felony murder (where the predicate offense is robbery) would not have been sufficient to prove any lesser-included offense. For that reason, at least in respect of those charges, the logic of *Bielkiewicz* is inapplicable.

■ That leaves defendant's convictions for robbery and theft. However, theft, by definition, is a lesser-included offense of robbery. *See State v. Lopez*, 187 *N.J.* 91, 98, 900 *A.2d* 779 (2006) (contrasting theft and robbery); *State v. Farrad*, 164 *N.J.* 247,

257, 753 *A.*2d 648 (2000) (defining theft as " 'the unlawful taking or exercise of unlawful control over property of another with purpose to deprive him thereof' " (quoting *State v. Carlos*, 187 *N.J.Super.* 406, 412, 455 *A.*2d 89 (App.Div.1982), *certif. denied*, 93 *N.J.* 297, 460 *A.*2d 693 (1983)), and robbery as theft by use of force, fear or intimidation); *State v. Walton*, 368 *N.J.Super.* 298, 308–309, 845 *A.*2d 1257 (App.Div.2004) (stating that "[t]heft is a lesser-included offense of robbery, and it is appropriate to charge theft if there is a question whether the defendant's act of inflicting bodily injury, using force upon another or threatening another with or purposefully putting him in fear of bodily injury occurred in the course of committing a theft" (citation, internal quotation marks and editing marks omitted)). And, more to the point, the indictment in fact charged defendant with both robbery and theft, and the jury was instructed as to both without objection.

In these circumstances, where the indictment substantively charged defendant with both the greater and lesser-included offenses, and the trial court properly instructed the jury in respect of each, the evil *Bielkiewicz* seeks to guard against—that is, that the jury could have found that one or more of the defendants were guilty of robbery while also finding that one or more of the defendants were guilty only of the lesser-included offense of theft—does not pose the same risk. We therefore conclude that it was not reversible error when the trial court instructed the jury on the elements of the offenses of robbery and theft, together with the elements required for accomplice liability, without also specifically charging that "[o]ur law recognizes that two or more persons may participate in the commission of an offense but each may participate therein with a different state of mind" and that "[t]he liability or responsibility of each participant for any ensuing offense is dependent on his/her own state of mind and not on anyone else's." *Model Jury Charge Criminal*, "Liability for Another's Conduct/Accomplice ( [w]here defendant is charged as accomplice and jury is instructed as to lesser[-]included charges)" (May 22, 1995). *See generally N.J.S.A.* 2C:2–6(c) (defining accomplice); *N.J.S.A.* 2C:2–6(b)(3) (providing that "[a] person is legally

accountable for the conduct of another when ... [h]e is an accomplice of such other person in the commission of an offense"). We therefore disagree with the Appellate Division's conclusion.

 That result is driven by a detailed review of the comprehensive jury charge, as a whole, actually given in this case. That painstaking evaluation, however, would have been largely unnecessary had the trial court additionally charged the jury according to *Bielkiewicz's* mandate. We therefore reaffirm the principles *Bielkiewicz* sets forth—that "when a prosecution is based on the theory that a defendant acted as an accomplice, the court is obligated to provide the jury with accurate and understandable jury instructions regarding accomplice liability even without a request by defense counsel[,]" *supra,* 267 *N.J.Super.* at 527, 632 *A.2d* 277—and we underscore the need to so instruct the jury when liability is sought to be imposed on an accomplice. That reaffirmation is based on a core and indisputable notion: that a principal and an accomplice, although perhaps liable for the same guilty act, may have acted with different or lesser mental states, thus giving rise to different levels of criminal liability.

We now reach defendant's claims on appeal, turning first to his contention that, as a matter of plain error, the State "misrepresented the legal defense to felony murder, and the court erred in failing to correct the prosecutor's misstatements."

## B.

 In its summation, the State specifically addressed the statutory affirmative defense to felony murder. The felony murder statute, *N.J.S.A.* 2C:11-3(a)(3), states that

> criminal homicide constitutes murder when ... the actor, acting either alone or with one or more other persons, is engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, ... and in the course of such crime or of immediate flight therefrom, any person causes the death of a person other than one of the participants[.]

It further provides that,

> in any prosecution under this subsection, in which the defendant was not the only participant in the underlying crime, it is an affirmative defense that the defendant:

(a) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and

(b) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons; and

(c) Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance; and

(d) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.
[*Ibid.*]

Defendant contends that the State mischaracterized or misstated the nature of the felony murder affirmative defense and that the trial court erred in not correcting the alleged mischaracterization on its own motion. The Appellate Division "discern[ed] no merit in defendant's contention ... that the prosecutor's misstatements in summation concerning the legal defenses to felony murder were unduly prejudicial." (citing *Rule* 2:11–3(e)(2) for proposition that "[w]hen[,] in an appeal in a criminal ... matter, the Appellate Division determines that some or all of the arguments made are without sufficient merit to warrant discussion in a written opinion, the court may affirm by specifying such arguments and quoting this rule and paragraph"). We concur in the Appellate Division's finding and, likewise, we conclude that defendant's complaint in respect of the State's summation concerning the statutory affirmative defense to a felony murder charge is without merit.

■ In its closing statement, the State outlined, with specificity and accuracy, all four elements of the felony murder affirmative defense codified at *N.J.S.A.* 2C:11–3(a)(3). The propriety of those efforts is underscored by defendant's failure to make any contemporaneous objection to that summation argument, rendering it " 'fair to infer from the failure to object below that in the context of the trial the error was actually of no moment.' " *State v. Nelson,* 173 *N.J.* 417, 471, 803 *A.*2d 1 (2002) (quoting *State v. Macon,* 57 *N.J.* 325, 333, 273 *A.*2d 1 (1971)). *See also State v. Papasavvas,* 163 *N.J.* 565, 626, 751 *A.*2d 40 (2000) (explaining that "[b]ecause defense counsel did not object to any of the prosecu-

tor's ... remarks ... now claimed to constitute prosecutorial misconduct, defendant must demonstrate plain error to prevail" (citation omitted)); *State v. Williams*, 113 *N.J.* 393, 453 n. 14, 550 *A.*2d 1172 (1988) (stating that "failure to object promptly to questionable comments, although not fatal, may oft-times result in not having the benefit of the trial court's exercise of its remedial powers on the propriety of the statements in issue"). Also, the trial court carefully tracked the State's summation in this respect and interjected, when it thought necessary, not to correct any "mischaracterizations" or "misstatements," but to emphasize that, once that affirmative defense is interposed, it is the State's burden to disprove one or more of those elements.

Our review of the State's summation in respect of the statutorily authorized affirmative defense to felony murder similarly compels the rejection of defendant's challenge. In doing so, we are governed by first principles:

> Prosecutors are expected to make a vigorous and forceful closing argument to the jury, and are afforded considerable leeway in that endeavor. Nevertheless, there is a fine line that separates forceful from impermissible closing argument. Thus, a prosecutor must refrain from improper methods that result in wrongful conviction, and is obligated to use legitimate means to bring about a just conviction.
>
> [*State v. Jenewicz*, 193 *N.J.* 440, 471, 940 *A.*2d 269 (2008) (citations and internal quotation marks omitted).]

Further, "[t]o justify reversal, the prosecutor's conduct must have been clearly and unmistakably improper, and must have substantially prejudiced the defendant's fundamental right to have a jury fairly evaluate the merits of his or her defense." *State v. Harris*, 181 *N.J.* 391, 495, 859 *A.*2d 364 (2004) (citation, internal quotation marks and editing marks omitted).

Taken as a whole, the State's summation fairly stated the elements of the statutory affirmative defense to a felony murder charge, followed by the State's legitimate, albeit partisan evaluation of the proofs relevant to that affirmative defense. We therefore concur with the Appellate Division's rejection of defendant's challenge to the State's summation concerning the felony murder affirmative defense. It follows, then, that because that

jury argument was proper, there was no need for the trial court somehow to correct, on its own motion, any claimed "misstatements" or "mischaracterizations."

We turn now to defendant's contention that the trial court erred in instructing the jury that it could consider defendant's voluntary absence from the trial as evidence of flight, that is, evidence of consciousness of guilt, a contention with which we agree.

## C.

 On October 21, 2002, defendant was present in court. Two significant events occurred that day. First, defendant was informed that Smith, one of his co-defendants, had pled guilty and would testify in defendant's upcoming trial. Second, defendant was notified that jury selection—and, hence, his trial—would start in two days, on October 23, 2002. Defendant failed to appear at any portion of the trial. Although it first instructed the jury to ignore defendant's absence from the trial,[10] the trial court later reversed itself and, over defense counsel's objection, concluded that defendant's voluntary absence from the trial constituted evidence of flight, that is, consciousness of guilt. It therefore determined that it was proper for the State to make reference to defendant's absence in its summation and to charge the jury accordingly. That determination was error.[11]

---

[10] See n. 6, supra, and accompanying text.

[11] The Appellate Division deferred reaching this question "in anticipation that a fuller record will now be presented to the trial judge on that issue." Although we need not comment thereon, we observe that the panel, in dicta, suggested that

> [o]n remand, the record may be amplified concerning the circumstances of defendant's absence from trial, and whether his departure was prompted by fears about the outstanding bench warrant · on other unrelated charges rather than a consciousness of guilt of the instant offenses. The remand may also consider the admissibility, under N.J.R.E. 404(b), of defendant's subsequent attempt to flee when he was discovered in Pennsylvania.
>
> On remand, we suggest that the judge, in his discretion, may wish to conduct an evidentiary hearing under N.J.R.E. 104 to explore these issues

The right to be present at a criminal trial belongs to no one other than the defendant. Although not specifically set forth in our Constitution, it is subsumed in the constitutional guarantees of "a speedy and public trial by an impartial jury; to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor; and to have the assistance of counsel in his defense." *N.J. Const.* art. I, ¶ 10. For the avoidance of doubt, we have stated that proposition in unequivocal terms: "Every criminal defendant has the right of presence at his own trial." *State v. W.A.*, 184 *N.J.* 45, 53, 875 *A.*2d 882 (2005). *See also State v. Colbert*, 190 *N.J.* 14, 22, 918 *A.*2d 14 (2007) (explaining that "the right of presence, securable by various means, is a well-settled principle of constitutional jurisprudence"). The converse of that proposition also holds: only a criminal defendant has the right to waive his constitutional right to be present, either directly or impliedly. *See, e.g., R.* 3:16(b) (requiring that "defendant shall be present at every stage of the trial," but providing that "[n]othing in this Rule, however, shall prevent a defendant from waiving the right to be present at trial" and allowing waiver when "(a) the defendant's express written or oral waiver [is] placed on the record, or (b) the defendant's conduct evidenc[es] a knowing, voluntary, and unjustified absence after (1) the defendant has received actual notice in court or has signed a written acknowledgment of the trial date, or (2) trial has commenced in defendant's presence"). It is against that backdrop that we evaluate the propriety of a flight charge based on a defendant's absence from the entire trial.

---

more fully, consistent with *State v. Mann*, 132 *N.J.* 410, 423–24, 625 *A.*2d 1102 (1993). The practical necessity to explain to a jury defendant's absence from trial will also be eliminated, since he presumably will attend the second trial. The trial judge will also have the opportunity on remand to consider more extensive briefing from counsel on the flight issue, including but not limited to the Supreme Court's recent opinion in *State v. Williams*, 190 *N.J.* 114, 919 *A.*2d 90 (2007) (addressing the probative value under *Rule* 404(b) of post-crime conduct as consciousness of guilt).

It is clear that "[f]light of an accused is admissible as evidence of consciousness of guilt, and therefore of guilt." *State v. Long*, 119 *N.J.* 439, 499, 575 *A.2d* 435 (1990) (citing *State v. Johnson*, 216 *N.J.Super.* 588, 612, 524 *A.2d* 826 (App.Div.1987)). That said, "[m]ere departure, however, does not imply guilt" as "[f]light requires departure from a crime scene under circumstances that imply consciousness of guilt." *Ibid.* (citing *State v. Sullivan*, 43 *N.J.* 209, 238, 203 *A.2d* 177 (1964), *cert. denied*, 382 *U.S.* 990, 86 *S.Ct.* 564, 15 *L.Ed.2d* 477 (1966)). *Accord State v. Knight*, 145 *N.J.* 233, 262, 678 *A.2d* 642 (1996); *State v. Wilson*, 57 *N.J.* 39, 49, 269 *A.2d* 153 (1970) ("A jury may infer that a defendant fled from the scene of a crime by finding that he departed with an intent to avoid apprehension for that crime. It is not necessary that he flee from custody or that he be found hiding."). The traditional triggering event for a flight charge is clear: " 'For departure to take on the legal significance of flight, there must be circumstances present and unexplained which, in conjunction with the leaving, reasonably justify an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid an accusation based on that guilt.' " *State v. Mann*, 132 *N.J.* 410, 418–19, 625 *A.2d* 1102 (1993) (quoting *Sullivan, supra,* 43 *N.J.* at 238–39, 203 *A.2d* 177).

Our Model Jury Charge on flight incorporates the notion that evidence of flight is probative if the flight is accompanied by an intent to avoid detection or apprehension. It explains that

> There has been some testimony in the case from which you may infer that the defendant fled shortly after the alleged commission of the crime. . . . The question of whether the defendant fled *after the commission of the crime* is another question of fact for your determination. Mere departure from a place where a crime has been committed does not constitute flight. If you find that the defendant, *fearing that an accusation or arrest would be made against (him/her)* on the charge involved in the indictment, took refuge in flight *for the purpose of evading the accusation or arrest on that charge,* then you may consider such flight in connection with all the other evidence in the case, as an indication or proof of consciousness of guilt. *Flight may only be considered as evidence of consciousness of guilt if you should determine that the defendant's purpose in leaving was to evade accusation or arrest for the offense charged in the indictment.*
>
> [*Model Jury Charge Criminal,* "Flight" (Apr. 24, 2000) (emphasis supplied).]

 The logically required tipping point—departure to avoid detection or apprehension—is absent here: by the time defendant voluntarily absented himself from any portion of the trial, he already had been arrested, indicted, admitted to bail, arraigned, had attended pre-trial hearings, and had attended at least one court-scheduled conference. Thus, from a purely definitional basis, a flight charge should not lie when a defendant absents himself from trial unless separate proofs are tendered to sustain the claim that the defendant's absence was designed to avoid detection, arrest, or the imposition of punishment.

 That result is mandated because a defendant's unexplained election to waive the right of presence may be riddled with fatal ambiguity.[12] Unless a defendant, by direct or implied word or deed, declares that he is absenting himself in order to get a leg up on his eventual pursuers because he in fact is guilty and the jury's verdict is a foregone conclusion, his voluntary absence, standing alone, is probative of little. Many different motives may lie behind a defendant's voluntary absence from trial, not all of them congruent with a consciousness of guilt. Thus, because in many instances its probative value will be substantially outweighed by its devastatingly prejudicial effect, *see, e.g., N.J.R.E.* 403, in the main a defendant's voluntary but unexplained absence

---

[12] Our Model Jury Charge reflects the ambiguous nature of a defendant's unexplained trial absence and seeks to ameliorate it by commanding that the jury be instructed as follows:

> As you know, (defendant) was absent from the trial. You should not speculate about the reason for his/her absence.
>
> You are not to consider for any purpose or in any manner in arriving at your verdict the fact that (defendant) was not present at trial. That fact should not enter into your deliberations or discussions in any manner, at any time.
>
> (Defendant) is entitled to have the jury consider all evidence presented at trial. He/she is presumed innocent even if he/she is not present.
>
> [*Model Jury Charge Criminal*, "Defendant's absence from trial" (June 14, 2004).]

In a footnote, however, that Model Charge notes that "[t]his instruction may need to be modified or may be inappropriate altogether if a Flight from Trial charge is warranted."

from trial, without more, should not give rise to a jury charge that his absence from trial constitutes evidence of consciousness of guilt.

Earlier case law recognized a substantive difference between those defendants who absent themselves from the entire trial and those who flee after trial has started, finding that unjustified flight occurring *after* a trial has started, coupled with other relevant proofs, may be sufficient to justify a flight charge. For example, in *State v. Melendez*, 129 *N.J.* 48, 51, 609 *A.*2d 1 (1992), a co-defendant fled after the State had rested its case; in those circumstances, we found no error when the trial court instructed the jury in accordance with the flight charge. By the same token, the Appellate Division approved a flight charge in *State v. Andrial*, 203 *N.J.Super.* 1, 6–7, 495 *A.*2d 878 (App.Div.1985), where the defendant fled in the middle of the night after his victim positively identified him at trial as the individual who raped her; the aggregate of the defendant's actions was sufficient to reasonably justify an inference that his flight was motivated by the desire to avoid conviction and was a circumstance tending to prove consciousness of guilt. Those cases, however, preceded amendments to *Rule* 3:16(b) that introduced a defined methodology for determining when a defendant's absence constituted a waiver of the right of presence, a change that brings into question the continued precedential value of those earlier decisions.

*State v. Horne*, 376 *N.J.Super.* 201, 869 *A.*2d 955 (App.Div.), *certif. denied,* 185 *N.J.* 264, 883 *A.*2d 1060 (2005), illuminates the applicable principles. In *Horne*, the defendant failed to appear for trial from its inception, yet the trial court instructed the jury in accordance with the Model Jury Charge in respect of flight. Reversing that defendant's conviction, the Appellate Division concluded that "[t]he failure to appear for trial does not necessarily constitute flight," *id.* at 210, 869 *A.*2d 955, rightly explaining that

[i]f defendant, as the State contends, waived his right to trial by failing to appear, his action was within the purview of *R.* 3:16(b). It appears logically inconsistent to attach a flight charge to behavior sanctioned by rule. We note, in this connection, that the "waiver" language of the present *R.* 3:16 was not part of

the Rule when *Melendez* and *Andrial, supra,* were decided. A defendant who exercises his right of waiver under *R.* 3:16(b) would otherwise do so with the onus of facing a highly prejudicial jury charge.
[*Id.* at 211, 869 *A.*2d 955.]

We endorse *Horne's* commonsense evaluation of the conundrum that will arise if a defendant's election to be absent from trial in its entirety and, hence, to waive his right to be present is allowed to boomerang into evidence of consciousness of guilt justifying a flight charge. We therefore conclude that, in the circumstances presented here, it was error to charge the jury that defendant's voluntary absence from trial, without more, was sufficient to consider that absence as demonstrating consciousness of guilt.

Having determined that it was error both to allow the State to argue to the jury and for the trial court to charge the jury that defendant's absence could be considered consciousness of guilt evidence, we nonetheless must determine whether that error was harmless. This is required because "[w]e will disregard 'any error or omission by the trial court unless it is of such a nature as to have been clearly capable of producing an unjust result.'" *State v. Castagna,* 187 *N.J.* 293, 312, 901 *A.*2d 363 (2006) (quoting *R.* 2:10–2; editing marks omitted). Moreover, "'before a . . . constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.'" *Ibid.* (quoting *Chapman v. California,* 386 *U.S.* 18, 24, 87 *S.Ct.* 824, 828, 17 *L.Ed.*2d 705, 710–11 (1967)). We have explained that "[t]he harmless error standard thus requires that there be 'some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached.'" *State v. R.B.,* 183 *N.J.* 308, 330, 873 *A.*2d 511 (2005) (quoting *State v. Bankston,* 63 *N.J.* 263, 273, 307 *A.*2d 65 (1973)).

Although the trial court properly continued the trial despite defendant's unexplained absence, we cannot conclude that, in these circumstances, the added steps of allowing the State to argue that defendant's absence constituted consciousness of guilt evidence

followed by the trial court's instruction to that effect were harmless, much less harmless beyond a reasonable doubt. The evidence showed that it was Moore who had carried a weapon into Taylor's apartment; it was Moore who had remained in the apartment guarding Noel, Maddox and North while Brown left with the safe; it was Moore who had remained in the apartment until Brown returned; it was Moore who was present when Maddox was mortally shot; and, when asked about Maddox's murder, it was Moore who had replied that there was "nothing we could do about it now, we did what we do so f* *k it, you know what I mean." Yet, despite those persuasive proofs, the jury acquitted Moore—who was present at the trial—of all charges, while it convicted defendant—who was conspicuously absent from the trial, so much so that, even before any instructions as to his absence were given, the jury questioned why he was not present. On the whole, then, the improper instruction and the equally improper argument it fostered were "clearly capable of producing an unjust result[.]" *R.* 2:10–2.

## IV.

The judgment of the Appellate Division is affirmed in part and reversed in part, and the cause is remanded to the Law Division for a new trial in accordance with the principles to which we have adverted.

*For affirmance in part/reversal in part/remandment*—Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS—6.

*Opposed*—None.