**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1873-17T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

BRANDON S. FLETCHER,

     Defendant-Appellant.

_____

        Argued May 13, 2019 – Decided June 11, 2019

        Before Judges Sabatino, Sumners and Mitterhoff.

        On appeal from Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 17-04-0184.

        Michele A. Adubato, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Michele A. Adubato, on the brief).

        Randolph E. Mershon, III, Assistant Prosecutor, argued the cause for respondent (Angelo J. Onofri, Mercer County Prosecutor, attorney; Randolph E. Mershon, III, of counsel and on the brief).

PER CURIAM

Tried by a jury, defendant Brandon Fletcher was found guilty of the criminal offense of prohibiting "certain persons" from possessing firearms. N.J.S.A. 2C:39-7(b)(1).  The trial court sentenced defendant to a seven-year prison term with a five-year period of parole ineligibility.  Defendant appeals his conviction and sentence.  We affirm.

I.

At approximately 4:24 p.m. on January 24, 2017, Detective Sarai Cheek of the Trenton Police Department responded to a report from a concerned citizen.  The report alleged that the citizen overheard a group of males arguing and saying that they were "going to get guns."  Police were accordingly dispatched to a building on Cleveland Avenue in Trenton identified by the caller.  While en route to the location, Detective Cheek, aware that she was driving through an area known for violence and drug activity, noticed two males on the front porch of another Cleveland Avenue address, but not the address to which the officers were dispatched.  The location with the males was an abandoned property.

Detective Cheek got out of her vehicle to investigate and potentially issue summonses to the two males for occupying a condemned dwelling.  One of the two males was defendant.  The other male has not been identified.  As Detective

Cheek approached, she observed defendant spot her, reach toward his waistband, jump off the porch, and run down a footpath cluttered with trash. Detective Cheek demanded that defendant stop, and chased him down the alley as he disobeyed.

As defendant ran from Detective Cheek, she noticed that he threw a gun into a yard and also dropped a glove. He eventually hopped fences, and escaped from Detective Cheek. However, because she had been broadcasting the chase over the radio, he was quickly spotted by other officers.

Detective Cheek's radio transmissions did not inform her co-officers of the weapon, and they were apparently otherwise unaware of that fact. After a brief chase and physical struggle, the officers apprehended defendant.

Shortly thereafter, Officer Cheek returned to the yard where she had seen defendant dispose of his weapon. She located there a .9 millimeter luger caliber, Ruger semiautomatic pistol with corresponding cartridges. Expert forensic analysis was unable to positively link defendant to the weapon through DNA or fingerprints. Hence, the State attempted to prove defendant's guilt by other means.

On September 19, 2017, defendant's trial commenced and continued through September 27, 2017. The State's witnesses at trial were Detective Cheek

A-1873-17T2

and Detective Brieer Doggett, who testified about the events on January 24, 2017 surrounding defendant's arrest. The State also presented testimony of a firearms and tool mark examiner who provided expert testimony about the type and operability of the gun Detective Cheek recovered; a police detective who provided expert testimony about the lack of fingerprints evidence linking defendant to the gun; and a forensic scientist who provided expert testimony about the lack of DNA profile suitable for comparison in this case.

Defendant testified, but did not present any other witnesses. Jury deliberations began on September 28, 2017, and lasted through October 3, 2017.

On Sunday, October 1, 2017, a gunman in Las Vegas, Nevada, aimlessly opened fire upon a crowd of concertgoers from a hotel window, killing dozens and injuring hundreds.[1]

When the present trial resumed on Tuesday, October 3, 2017, Juror Number Two brought to the trial court's attention concerns about the Las Vegas incident. The juror stated that, in part due to the recent events in Las Vegas, she was unable to be impartial in carrying out her duties on the jury. She claimed to be suffering from severe anxiety, migraine headaches, and a lack of sleep.

---

[1] See Las Vegas Shooting, CBS News, https://www.cbsnews.com/feature/las-vegas-shooting/ (last visited May 28, 2019) (a link providing access to a wide range of media coverage beginning the day of the events).

Based upon this information, the trial court questioned Juror Number Two in counsel's presence regarding whether she had discussed the matter with any other jurors. She asserted she had not. Juror Number Two was then excused from service and replaced with an alternate juror. The trial court did not voir dire any of the other jurors to determine if they had been affected by the events or Juror Number Two's exposure. No such voir dire request was made by counsel.

On the same day, October 3, 2017, the jury returned a verdict, finding defendant guilty of violating N.J.S.A. 2C:39-7(b)(1), certain persons not to possess a firearm, which was the only count of the indictment that the State pursued at trial.

On November 17, 2017, the trial court sentenced defendant to a seven-year prison term, with a five-year minimum parole ineligibility period. The judge found that aggravating factors three, six, and nine applied, as well as mitigating factor eleven.

## II.

On appeal, defendant raises the following points for our consideration:

POINT I

THE FAILURE OF THE COURT TO VOIR DIRE THE JURY DURING DELIBERATIONS

FOLLOWING THE LAS VEGAS SHOOTING MASSACRE WAS ERROR WHICH DEPRIVED DEFENDANT OF A FAIR TRIAL.

POINT II

TESTIMONY REGARDING STATEMENTS MADE BY A "CONCERNED CITIZEN" WAS INADMISSIBLE HEARSAY WHICH VIOLATED THE DEFENDANT'S RIGHT OF CONFRONTATION.

POINT III

THE INSTRUCTION TO THE JURY ON FLIGHT OVER DEFENDANT'S OBJECTION WAS ERROR.

POINT IV

THE SEVEN (7) YEAR SENTENCE WITH FIVE (5) YEARS OF PAROLE INELIGIBILITY WAS MANIFESTLY EXCESSIVE AND SHOULD BE MODIFIED AND REDUCED.

Having considered these points in light of the record and the applicable law, we affirm both defendant's conviction and sentence.

A.

We first address defendant's argument that he was deprived of a fair trial because of the trial judge's decision not to voir dire the entire jury following the Las Vegas shooting incident and Juror Number Two's reaction to that event. We review the trial court's handling of this juror issue under an abuse of discretion

6

standard. State v. R.D., 169 N.J. 551, 560-61 (2001). "[T]he decision to voir dire individually the other members of the jury best remains a matter for the sound discretion of the trial court" and there is "[n]o per se rule." Id. at 561.

As we have noted, defense counsel did not request a voir dire of the entire jury regarding the Las Vegas incident. Consequently, defendant must demonstrate plain error, i.e., that the error was "clearly capable of producing an unjust result." R. 2:10-2; see also State v. Macon, 57 N.J. 325, 336-37 (1971). We find no such abuse of discretion or plain error under the circumstances presented.

Certain general principles guide our analysis. "The Sixth Amendment of the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution guarantee criminal defendants 'the right to . . . trial by an impartial jury.'" R.D., 169 N.J at 557 (quoting U.S. Const. amends. VI, XIV; N.J. Const. art. I, ¶ 10). "[T]he securing and preservation of an impartial jury goes to the very essence of a fair trial." State v. Bey, 112 N.J. 45, 75 (1988) (quoting State v. Williams, 93 N.J. 39, 60 (1983)). The guarantee of an impartial jury "includes the right to have the jury decide the case based solely on the evidence presented at trial, free from the taint of outside influences and extraneous matters." R.D., 169 N.J. at 557.

"[I]f during the course of the trial it becomes apparent that a juror may have been exposed to extraneous information, the trial court must act swiftly to overcome any potential bias and to expose factors impinging on the juror's impartiality." Id. at 557-58. The trial court "is obliged to interrogate the juror, in the presence of counsel, to determine if there is a taint; if so, the inquiry must expand to determine whether any other jurors have been tainted thereby." Id. at 558 (emphasis added). The expanded inquiry may entail asking the tainted juror if he or she discussed the subject with fellow jurors; depending on the juror's response, the inquiry may extend to individual examination of other jurors.

In Bey, 112 N.J. at 83-84, the Supreme Court laid out a two-part inquiry for trial courts to conduct when "presented with a post-impanelment motion to question the jury about exposure to trial publicity." According to the Bey two-part inquiry, "[t]he court should first examine the information disseminated to determine if it has the capacity to prejudice the defendant." Id. at 84. If there is such a capacity to prejudice the defendant, the trial court "should determine if there is a realistic possibility that such information may have reached one or more of the jurors." Id. at 86.

After reviewing the present record, we find no basis to second-guess the trial court's handling of Juror Number Two raising concerns about her ability to

8

be unbiased after the Las Vegas shooting. The trial judge questioned the juror as to the nature of her inability to continue as a juror. He also questioned whether she discussed this with the other jurors; which she denied doing. See R.D., 169 N.J. at 560 ("An appropriate voir dire of a juror allegedly in possession of extraneous information mid-trial should inquire into the specific nature of the extraneous information, and whether the juror intentionally or inadvertently has imparted any of that information to other jurors."). Based on this information, the judge appropriately excused Juror Number Two.

Following these developments, the trial judge instructed the jury that Juror Number Two was being excused for "entirely personal" reasons having "nothing to do with her views on this case or her relationship with the other members of the deliberating jury" and asked them not to "speculate on the reason why that juror was excused." Neither the State nor defendant's counsel objected to the trial court's handling of this issue at the time of the trial.

Given this record, the trial judge reasonably exercised his discretion to provide instructions to the jury regarding Juror Number Two's dismissal, without, sua sponte, conducting an unrequested individual voir dire of the other jurors about the Las Vegas incident. As the Supreme Court has noted, "In some instances, the [trial] court may find that it would be more harmful to voir dire

9

the remaining jurors because, in asking questions, inappropriate information could be imparted." Id. at 561.

This case is unlike Bey, which involved a murder trial, where the potentially tainting publicity was about the defendant and disclosed prejudicial information including that the defendant was going to be tried for a second murder. 112 N.J. at 90. Here, the potentially tainting news coverage was about a separate incident, which was not substantially similar to the possessory crime for which defendant was charged.

Defendant was charged with a certain persons offense that made it unlawful for him to carry a firearm. The trial focused on whether or not he had possessed that firearm. The trial did not involve a shooting incident or any act of gun violence by defendant. The incident in Las Vegas, while tragic and widely covered in the news media, was not comparable to the possessory charge against defendant. We are not persuaded that the news reports about the Las Vegas shooting had the capacity to prejudice the defendant, even assuming other jurors were exposed to that publicity.

We find the trial judge properly utilized his discretion to question and dismiss Juror Number Two, but not voir dire the entire jury. In making this finding, we do not preclude the possibility that, in a future case, the prejudicial

10

potential of a widely covered incident may rise to a level where voir dire of the jury may be required.[2] See, e.g., State v. Jasuilewicz, 205 N.J. Super. 558, 567-68 (App. Div. 1985) (finding the trial court should have conducted a voir dire of the jury regarding possible taint in a homicide case where the defendant raised an insanity defense at a time when there was extensive national discussion about the acquittal, on the basis of insanity, of John Hinckley, Jr. for the attempted assassination of President Reagan).

B.

The second issue raised by defendant concerns the testimony of Detectives Cheek and Doggett regarding the concerned citizen's call they were responding to when Detective Cheek observed defendant outside of the abandoned property. Detective Cheek specifically testified on direct examination, "We received a call from a concerned citizen stating that there was a group in the area and they were talking about – basically, they were saying that they – she overheard a group of

---

[2] For example, if the crime charged involved substantially similar allegations as the outside incident or the incident occurred in the same community, there may more compelling reasons for the trial court to voir dire the entire jury to ensure there is no taint. We do not express any opinion on what the proper course of action would be in these potential situations, but rather entrust these decisions to the future "sound discretion of the trial court." R.D., 169 N.J. at 561.

males arguing and saying that they were going to get guns and shooting someone up."

Detective Doggett testified on direct examination that the call "was [from] a concerned citizen. [The caller] said she overheard a group of males saying that they were gonna shoot someone. And she said she heard a brief argument."

Defendant argues that this testimony by Detectives Cheek and Doggett about the citizen's call constituted inadmissible hearsay, and violated his rights under the confrontation clauses of the United States and New Jersey Constitutions. We disagree.

Notably, defense counsel did not object to any of this testimony at trial. Consequently, defendant must demonstrate plain error to obtain relief. R. 2:10-2; see also State v. Macon, 57 N.J. 325, 336-37 (1971). We find no error, let alone plain error, in admitting the testimony of the two officers regarding the concerned citizen call.

The United States and New Jersey Constitutions guarantee a criminal defendant the right to confront "the witnesses against him." U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10. However, "[t]he Confrontation Clause does not condemn all hearsay." State v. Branch, 182 N.J. 338, 349 (2005). Particularly

12

applicable in this case, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Crawford v. Washington, 541 U.S. 36, 59 n.9 (2004) (citing Tennessee v. Street, 471 U.S. 409, 414 (1985)).

It does not violate the hearsay rule for police officers to explain their reasons for taking investigatory steps, such as arriving at a crime scene, by stating this was done "upon information received." State v. Bankston, 63 N.J. 263, 268 (1973). Such testimony is admissible "to show that the officer was not acting in an arbitrary manner or to explain his [or her] subsequent conduct." Ibid. That said, the Court recognized in Bankston that the hearsay rule and defendant's constitutional right to confront witnesses against him are violated if an officer's testimony "becomes more specific by repeating what some other person told [him or her] concerning a crime by the accused." Ibid. "The common thread" running through Bankston and subsequent cases "is that a police officer may not imply to the jury that he possesses superior knowledge, outside the record, that incriminates the defendant." Branch, 182 N.J. at 351.

While the detectives' testimony in this case literally does go beyond merely stating that they were in the area of Cleveland Avenue "upon information received," the testimony does not rise to a level of insinuating any conduct by

A-1873-17T2

defendant or that the detectives possessed superior knowledge incriminating him. Instead, the detectives' testimony served to explain why police officers were responding to a different property on the same block where defendant was located.

The concerned citizen call was for another address on Cleveland Avenue, which Detective Cheek did not go to before seeing defendant. Rather, Detective Cheek's testimony illuminates that she confronted defendant and the unidentified man because they were outside of an abandoned building in a high crime area, not because of the contents of the concerned citizen call. This was not an instance where the "logical implication" of the detectives' testimony would lead "the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt." Bankston, 63 N.J. at 271. The concerned citizen call only provided the reason the officers were physically near where defendant was located. The detectives' testimony did not insinuate that the concerned citizen had identified the defendant, or that the call was the basis upon which Detective Cheek stopped defendant.

Furthermore, this testimony from the detectives was invited by defense counsel's opening statement. Cf. State v. James, 144 N.J. 538, 554 (1996) ("The doctrine of opening the door allows a party to elicit otherwise inadmissible

14

evidence when the opposing party has made unfair prejudicial use of related evidence."). In his opening statement, defense counsel discussed the substance of the concerned citizen call, including that "somebody is possibly threatening with a gun" and further argued that the officers "react[ed] first" to defendant and the unidentified man as the first suspicious people in the area.

Defense counsel also raised similar arguments in his cross-examination of Detective Cheek and his summations. This is an instance where the testimony was elicited to respond to an allegation by defense counsel that the police officers acted irrationally in confronting defendant. See Branch, 182 N.J. at 352 ("The exception would be the defendant who opens the door by flagrantly and falsely suggesting that a police officer acted arbitrarily or with ill motive. In such a circumstance, the officer might be permitted to dispel that false impression, despite the invited prejudice the defendant would suffer.")

Furthermore, the prosecutor did not highlight this testimony in his closing argument. Cf. State v. Thomas, 168 N.J. Super. 10, 16 (App. Div. 1979) (noting it was contrary to Bankston for the prosecutor to assert, during his summation, that police learned from an informant that defendant may have been involved in a robbery). The prosecution's actual use of the concerned citizen testimony further illustrates that the State did not misuse the testimony to show defendant's

guilt, but rather to respond to arguments that the officers acted unreasonably in confronting defendant on Cleveland Avenue.

Finally, defendant waived any Confrontation Clause argument by failing to raise it in a timely manner at trial. See State v. Wilson, 227 N.J. 534, 543 (2017). This is not a case where the failure to object was "so patently unreasonable and so clearly erroneous that no rational counsel acting within the wide range of professional norms would pursue such a course." State v. Williams, 219 N.J. 89, 99 (2014). Rather the testimony was used by defense counsel to challenge the officers' decision to confront and arrest defendant.

For these many reasons, we do not find error in the admittance of the testimony of the detectives regarding the concerned citizen call.

C.

Defendant next argues that the trial court should not have issued a flight charge to the jury. Defendant's trial counsel initially objected to the flight charge. However, defense counsel stated that he had no objection to the final version of the jury charge, which the trial court amended to include defendant's explanation for his departure from the location.

To be sure, "[a]ppropriate and proper charges to a jury are essential for a fair trial." State v. Green, 86 N.J. 281, 287 (1981). Indeed, "[e]rroneous jury

instructions on matters material to a jury's deliberations are ordinarily presumed to be reversible error." State v. Jackmon, 305 N.J. Super. 274, 277-78 (App. Div. 1997). Recognizing the importance of proper jury charges, particularly in criminal cases, we do not find any error in the trial court's decision to charge the jury on flight.

The Supreme Court has recognized that "[f]light of an accused is admissible as evidence of consciousness of guilt, and therefore of guilt." State v. Ingram, 196 N.J. 23, 46 (2008) (alternation in original) (quoting State v. Long, 119 N.J. 439, 499 (1990)). "A jury may infer that a defendant fled from the scene of a crime by finding that he departed with an intent to avoid apprehension for that crime." State v. Wilson, 57 N.J. 39, 49 (1970). "Mere departure, however, does not imply guilt." Long, 119 N.J. at 499. Therefore, "[a] jury must be able to draw reasonable inferences from the evidence; it may not be left to speculate." State v. Randolph, 228 N.J. 566, 595 (2017). The "evidence of flight must be 'intrinsically indicative of a consciousness of guilt.'" Id. at 595 (quoting State v. Randolph, 441 N.J. Super. 533, 562 (App. Div. 2015)).

The trial judge's flight instruction was not unduly prejudicial, or otherwise inappropriate, given the evidence adduced at the trial. Defendant admitted to running from police, providing an alternative explanation for his departure,

namely that he supposedly ran because a police officer pointed a weapon at him. According to Detective Cheek's testimony, while running from her, defendant disposed of a firearm. This provided a basis for the jury to make a reasonable inference that defendant had fled to avoid police finding him in possession of a firearm. The jury was allowed to make such an inference if it found Detective Cheek's testimony more credible than defendant's explanation.

Moreover, the trial court's jury instruction, which closely followed the model jury instruction, properly included defendant's alternative explanation for the flight and explained what inferences the jury could make from the defendant's flight. See State v. Mann, 132 N.J. 410, 421 (1993) (articulating requirements for jury instructions on flight, particularly when a defendant offers a possible alternative explanation for the flight); see also Model Jury Charges (Criminal), "Flight" (rev. May 10, 2010).

In sum, this issue is also unavailing for defendant.

## D.

Finally, defendant argues his sentence of seven years, with a five-year parole disqualifier, is manifestly excessive. At sentencing, defendant's counsel requested a sentence of five years, with five years parole ineligibility, which is the statutory minimum sentence for defendant's certain persons offense, because

defendant previously had been convicted of aggravated assault. N.J.S.A. 2C:39-7(b)(1). The State requested a nine-year sentence with five years of parole ineligibility. The trial judge selected a custodial term in between these opposing requests.

As our Supreme Court has reaffirmed, "when [trial judges] exercise discretion in accordance with the principles set forth in the Code [of Criminal Justice] and defined by [the Court] . . ., they need fear no second-guessing." State v. Bieniek, 200 N.J. 601, 607-08 (2010) (quoting State v. Ghertler, 114 N.J. 383, 384-85 (1989)).

Once the trial court has balanced the aggravating and mitigating factors set forth in N.J.S.A. 2C:44-1(a) and -1(b), it "may impose a term within the permissible range for the offense." Id. at 608; see also State v. Case, 220 N.J. 49, 54 (2014) (remanding for resentencing because the trial court relied on "unfounded assumptions rather than evidence in the record" in finding a "critical" aggravating factor); State v. Fuentes, 217 N.J. 57, 63 (2014) (remanding for resentencing because the trial court "did not adequately explain its findings" for the aggravating factors).

Here, the trial court found the following aggravating factors applied: three, N.J.S.A. 2C:44-1(a)(3), the risk that defendant will commit another

offense; six, N.J.S.A. 2C:44-1(a)(6), the extent of defendant's prior criminal record and the seriousness of the offenses for which he has been convicted; and nine, N.J.S.A. 2C:44-1(a)(9), the need for deterring the defendant and others from violating the law. The judge also found mitigating factor eleven, N.J.S.A. 2C:44-1(b)(11), the imprisonment of defendant would entail excessive hardship on himself or his dependents, applied because defendant has a child.

Although the trial judge found the aggravating factors outweighed the mitigating factors, he still did not sentence defendant to the nine years requested by the State. Instead, the trial judge found a seven-year sentence, with a five-year parole ineligibility, "appropriate in this situation."

We are satisfied that the trial judge adhered to the sentencing guidelines, and properly considered and explained his evaluation of the aggravating and mitigating factors.

We also reject defendant's argument that the sentence amounts to a "trial tax" because it is more stringent than the State's pretrial plea offer. When defendant decided not to accept the State's plea offer, the trial court informed him that he faced a maximum possible sentence of twenty years, with parole ineligibility of ten years, if he went to trial. Defendant went to trial knowing he would be exposed to the risk of a greater sentence than the plea offer.

Furthermore, the plea offer was based on defendant pleading guilty plea to count one of the indictment, unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1). At trial, the jury found defendant guilty on count five of the indictment, the certain persons charge, which includes a five-year mandatory minimum with a five-year parole disqualifier. N.J.S.A. 2C:39-7(b)(1). The trial court properly sentenced defendant for the discrete crime the jury found him guilty of at the trial.

On the whole, we discern no abuse of discretion or legal error in defendant's sentence. The record supports the trial judge's findings, and the sentence imposed is clearly reasonable and does not shock our judicial conscience. See State v. Roth, 95 N.J. 334, 365 (1984) (appellate courts may not substitute their judgment for that of the sentencing court, unless the application of the sentencing guidelines to the facts makes the sentence "clearly unreasonable so as to shock the judicial conscience").

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1873-17T2