NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R. 1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-4358-14T2

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

CARLOS ROJAS, a/k/a CARLOS
BENITEZ, a/k/a CARLOS
ROJAS-BENITEZ,

 Defendant-Appellant.

________________________________________________________________

 Submitted September 20, 2017 – Decided November 20, 2017

 Before Judges Simonelli and Rothstadt.

 On appeal from Superior Court of New Jersey,
 Law Division, Morris County, Indictment No.
 12-09-1046.

 Walter Murawinski, attorney for appellant.

 Fredric M. Knapp, Morris County Prosecutor,
 attorney for respondent (Erin Smith Wisloff,
 Supervising Assistant Prosecutor, on the
 brief).

PER CURIAM

 A jury convicted defendant Carlos Rojas of committing first-

degree aggravated manslaughter, N.J.S.A. 2C:11-4(a), and other
crimes arising from his role in the killing of a friend and the

disposal of the victim's remains. On appeal, defendant challenges

his conviction and sentence. He argues that the trial court failed

to properly respond to questions asked by the jury during

deliberations. He also contends his conviction was the result of

ineffective assistance of trial counsel and the prosecutor's

improper comments to the jury during summations. In addition,

defendant challenges his sentence by arguing that the aggregate

thirty-year prison term imposed by the trial court was excessive

in light of his minimal criminal history. We reject these

contentions and affirm.

 The facts leading to defendant's arrest and conviction as

developed at trial are summarized as follows. On August 4, 2011,

the Lincoln Park Police Department discovered an abandoned vehicle

at the bottom of an embankment. Upon inspection, police found

that the car was unlocked, in park, and the interior of the vehicle

had been doused in motor oil. They also discovered a business

card for a car wash. Later, detectives also noted that the car

stereo was missing.

 When the police opened the vehicle's trunk, they discovered

the body of Esteban Hernandez. The county medical examiner later

determined Hernandez died of blunt force trauma to the head,

 2 A-4358-14T2
consistent with wounds that would result from being beaten by a

hammer and that the manner of death was homicide.

 Using a receipt from a supermarket, also found in the car

near a bag of peaches, detectives were able to obtain security

footage from the supermarket showing the victim and an unidentified

male purchasing the peaches and beer on the afternoon of August

3, 2011. Police detectives were able to determine Hernandez's

cell phone number and discovered it was registered under

defendant's name. They obtained a photograph of defendant that

appeared to match the unidentified male in the supermarket

surveillance video.

 Detectives went to defendant's residence and questioned him

about Hernandez. Ultimately, they transported defendant to the

police station for further questioning. At the station, defendant

told conflicting stories to detectives, which led to them charging

defendant with hindering his own apprehension. Defendant was

placed under arrest and transported to the county jail.

 The police continued their investigation and conducted a

search of defendant's residence and automobile. In defendant's

bedroom, detectives discovered bloodstained clothing that matched

the clothes worn by defendant in the surveillance video. A

detective, who was qualified as an expert in blood stain pattern

analysis, examined the bloody shirt and concluded that the

 3 A-4358-14T2
"[s]tains . . . were consistent with impact spatter," "cast-off

spatter," "expirated blood," and "transfer pattern blood." The

search of defendant's car yielded, among other items, a GPS device,

which police used to determine that the car was in Lincoln Park,

near the location where Hernandez's body was found, at 8:50 p.m.

on August 3, 2011.

 In addition to the evidence obtained through their

investigation, detectives received information about defendant's

role in Hernandez's murder from a third party, Joseph Masino, an

inmate at the county jail, who shared a cell with defendant. He

met with detectives after claiming he had information regarding

defendant's involvement in Hernandez's death. Masino stated

defendant told him that he beat the victim to death with a hammer

after an argument over $4000 "got out of hand," and afterward he

and another individual transported the body to Lincoln Park.

 The information provided by Masino led the detectives to a

garage located in Fairview owned by Oscar Aleman, a mechanic who

was teaching defendant how to repair cars. Oscar wore a green t-

shirt with an emblem that matched the one on the business card

found in the victim's vehicle. The police spoke to Oscar1 and

Oscar's then eleven-year-old son, John Aleman.

1
 First names are used to avoid confusion.

 4 A-4358-14T2
 John stated that on August 3, 2011, he and his father were

returning home when they observed two men, including defendant,

who he knew as his father's friend, stealing Oscar's stereo system

from the garage and placing it in a vehicle. When they entered

the garage, John saw defendant standing over Hernandez and holding

a hammer. He did not see defendant strike the victim, nor did he

recall whether he saw blood. Defendant told John and his father

that if they "ever said anything, he would . . . come after

[them]." John recalled seeing the hammer before; however, he did

not know what happened to it after that day. Oscar told John not

to tell anyone what he saw.

 According to defendant,2 it was Oscar who killed Hernandez.

He stated he was with Hernandez when the two of them went to

Oscar's garage. While there, Hernandez started to steal items

from the garage before Oscar arrived. When Oscar appeared, he and

Hernandez began to fight, during which Oscar struck Hernandez in

the head with a hammer numerous times. Fearful for his own life,

defendant helped Oscar move the body to where it was discovered

in Lincoln Park. According to defendant, he could not have been

2
 Defendant testified at trial. On cross-examination, he
conceded that he had given three different versions of the facts
relating to the murder. In fact, defendant acknowledged that his
August 5, 2011 statement to police contained up to twenty-five
lies.

 5 A-4358-14T2
the killer as he is left handed and according to expert testimony,

the person who killed Hernandez had to be right handed, and Oscar

was right-handed.

 A Morris County Grand Jury returned an indictment charging

defendant with first-degree murder, N.J.S.A. 2C:11-3(a)(1)-(2)

("count one"); first-degree felony-murder, N.J.S.A. 2C:11-3(a)(3)

("count two"); first-degree kidnapping, N.J.S.A. 2C:13-1(b)(1)-

(2) ("count three"); second-degree desecrating human remains,

N.J.S.A. 2C:22-1(a)(1) ("count four"); third-degree possession of

a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d) ("count

five"); fourth-degree unlawful possession of a weapon, N.J.S.A.

2C:39-4(d) ("count six"); third-degree theft from a person,

N.J.S.A. 2C:20-3(a) and N.J.S.A. 2C:20-2(b)(2)(d) ("count seven");

fourth-degree theft by unlawful taking, N.J.S.A. 2C:20-3(a) and

N.J.S.A. 2C:20-2(b)(3) ("count eight"); and third-degree hindering

one's own apprehension, N.J.S.A. 2C:29-3(b)(4) ("count nine").

 At the conclusion of defendant's trial, the jury acquitted

defendant of the first two counts, but convicted him of the lesser-

included offense of first-degree aggravated manslaughter and the

remaining counts as charged. The trial court sentenced defendant

to an aggregate term of thirty years. This appeal followed.

 Defendant presents the following arguments for our

consideration:

 6 A-4358-14T2
 POINT I

 THE TRIAL COURT ERRED IN FAILING TO
 QUESTION JUROR #2 INDIVIDUALLY AND
 IN FAILING TO RECHARGE THE JURY ON
 REASONABLE DOUBT. (Raised Below).

 POINT II

 APPELLANT WAS DEPRIVED OF A FAIR
 TRIAL DUE TO THE INEFFECTIVE
 ASSISTANCE OF COUNSEL. (Not Raised
 Below).

 POINT III

 THE IMPROPER SUMMATION OF THE
 PROSECUTOR DEPRIVED APPELLANT OF A
 FAIR TRIAL. (Not Raised Below).

 POINT IV

 GIVEN APPELLANT'S COMPLETE LACK OF
 A CRIMINAL RECORD, THE THIRTY-YEAR
 SENTENCE IMPOSED WAS EXCESSIVE.[3]
 (Raised Below).

 We begin our review by addressing defendant's contentions

concerning the trial court's response to issues raised by the

jury. During deliberations on Thursday, October 30, 2014, the

3
 Defendant raised an additional argument in his reply brief
claiming that "the trial court erred by permitting the State to
elicit net opinions that" should not have been admitted. Because
this argument was not raised in his merits brief, we do not
consider it in support of his appeal. See Drinker Biddle & Reath
LLP v. N.J. Dep't of Law & Pub. Safety, 421 N.J. Super. 489, 496
n.5 (App. Div. 2011) (citations omitted) (providing that claims
not addressed in the appellant's merits brief were deemed
abandoned, and could not properly be raised in a reply brief).

 7 A-4358-14T2
jury sent out two notes.4 The first note asked the court to adjourn

at 4:30 p.m. that day and to resume the trial on the following

Monday. The second note, written by juror number two, stated, "I

[cannot] continue to serve on this [j]ury. We are making no

headway on this case. We have a [j]uror who almost needs certainty

before he can make a guilty verdict. I am being asked to be

excused from this [j]ury."

 In response to the first note, the parties told the court

they preferred that the jurors continue their deliberations, even

if it meant holding the jury beyond 4:30 p.m. that day and

continuing the next day, rather than adjourning until Monday. The

court decided to give the jurors the option of staying late that

day or continuing the following day.

 As to the second note, the prosecutor suggested that the jury

should be "recharg[ed] on reasonable doubt[5] and the burden of

proof." Defense counsel stated he was concerned juror two was

being pressured. He asked the court to question the juror

4
 Defendant's brief makes reference to a third note that is not
the subject of his appeal. He states that the note advised the
court that the jury had agreed on seven charges but could not
reach a decision as to the balance and requested "advice" from the
court. A copy of the note was not included in the appendix.
5
 During the court's original charge to the jury, it instructed
the jurors on the concept of reasonable doubt, consistent with the
Model Jury Charge (Criminal), "Reasonable Doubt" (1997).

 8 A-4358-14T2
individually. The court refused to interview juror two because

it believed "there[ were] inherent problems with bringing out one

juror . . . and isolating him with the other jurors waiting."

Accordingly, the court brought out all of the jurors, and addressed

both notes by stating the following:

 I am not going to excuse any juror from this
 jury at this time. You all took an oath to
 continue to deliberat[e] -- through
 deliberations under the instructions I've
 given you and . . . there's no doubt in my
 mind that you've listened very carefully. And
 that you've also indicated that you're at a
 point where you're in agreement on certain
 issues and you're still in deliberation on
 other issues. . . . I am going to require
 that you continue those . . . deliberations
 with all [twelve] deliberating jurors.

 When you reach the point where you feel
 in good conscious you have considered that
 further and that you cannot come to agreement,
 then you can hand out a note and either tell
 me that consistent with the charges that I've
 given you that you've reached a complete jury
 verdict or . . . you're still in agreement on
 certain issues but [are] not able to agree on
 others, and then I would bring you out and
 give you some further instructions.

 Now, because of these developments and
 because . . . I've reflected on the time, and
 this is my decision, I recognize that some of
 you have been making commitments for Fridays,
 but I am concerned that if I release you until
 Monday this would only create greater
 problems. So I am going to direct that you
 continue your deliberations, and I'm going to
 give you the choice, you can continue them
 this evening or if you feel it more
 appropriate you'd have to come back tomorrow.

 9 A-4358-14T2
 But I'm not going to release you until Monday
 at this time.

 . . . .

 [I]t is your duty, as jurors, to consult with
 one another and to deliberate with a view to
 reaching an agreement, if you can do so
 without violence to individual judgment. Each
 of you must decide the case for yourself, but
 do so only after an impartial consideration
 of the evidence with your fellow jurors. In
 the course of your deliberations, do not
 hesitate to re-examine your own views and
 change your opinion if convinced it is
 erroneous but do not surrender your honest
 conviction as to weight or the effect of
 evidence solely because of the opinion of your
 fellow jurors, or for the mere purpose
 of . . . returning a verdict. You are not
 partisans. You are judges, judges of the
 facts.

 . . . .

 And I don't want any jurors singling out any
 other juror in any way.

After returning to the jury room, the jury sent out a note stating

it would continue deliberating into the evening. The jury rendered

its verdict approximately one-half hour later.

 Defendant argues on appeal that the court interfered with his

right to a fair trial by not re-instructing the jury as to

reasonable doubt, and failing to question juror two as to the

nature of the conflict with the other jurors. In addition, he

contends that the court's failure to agree to the jury's preferred

schedule "coercive[ly]" gave them the option to either deliberate

 10 A-4358-14T2
further Thursday evening or reconvene for deliberations on Friday.

We disagree.

 "We traditionally . . . accord[] trial courts deference in

exercising control over matters pertaining to the jury." State

v. R.D., 169 N.J. 551, 559-60 (2001). Whether the court failed

to properly exercise its discretion in handling issues with the

jury, such as removing and substituting a deliberating juror,

State v. Musa, 222 N.J. 554, 564-65 (2015), depends upon whether

the court's actions impaired the defendant's right "to be tried

before an impartial jury[, which] is one of the most basic

guarantees of a fair trial." See State v. Brown, 442 N.J. Super.

154, 179 (App. Div. 2015) (quoting State v. Loftin, 191 N.J. 172,

187 (2007)).

 Applying this deferential standard, we find no abuse of the

court's discretion in deciding to disagree with the jury's

requested schedule for deliberations or its decision to not

interview juror two. As to the schedule, defendant urged the

court to continue deliberations despite the jurors' request. We

find nothing coercive about allowing the jury to continue

deliberations, especially when the court gave the jury the option

of adjourning for the day and continuing the next day. But cf.

State v. Figueroa, 190 N.J. 219, 242 (2007) (finding the trial

court's instructions to the jury were "inappropriately coercive");

 11 A-4358-14T2
In re Stern, 11 N.J. 584, 590 (1953) (finding "[u]ndue stress was

laid upon the economic element and the importance of a verdict;

agreement to avoid the expense of a retrial of the cause was the

dominant consideration, and the result betokens its coercive

tendency and effect."). We conclude there was no impairment of

defendant's right to a fair trial on these grounds.

 We reach the same conclusion as to the court's rejection of

defendant's request for the court to interview juror two about his

desire to not participate in further deliberations. The court's

decision was consistent with the Supreme Court's limitations on a

court's ability to interfere with deliberations. Those

limitations recognize that jury deliberations often become heated,

and jurors may place all sorts of pressures on each other in the

course of deliberations. See State v. Young, 181 N.J. Super. 463,

468 (App. Div. 1981), certif. denied, 91 N.J. 222 (1982). It is

not the court's role to inquire into deliberations, absent evidence

of impropriety, such as "[a] physical altercation between two or

more deliberating jurors[, which] constitutes an irreparable

breakdown in the civility and decorum expected to dominate the

deliberative process." State v. Dorsainvil, 435 N.J. Super. 449,

482 (App. Div. 2014).

 Removal of a juror during deliberations is allowed only as a

last resort "[b]ecause juror substitution poses a clear potential

 12 A-4358-14T2
for prejudicing the integrity of the jury's deliberative process."

State v. Hightower, 146 N.J. 239, 254 (1996); State v. Valenzuela,

136 N.J. 458, 468-69 (1994). For that reason, Rule 1:8-2(d)(1)

permits the removal and substitution of jurors in criminal trials

after deliberations have begun "only in specifically defined

circumstances." State v. Jenkins, 182 N.J. 112, 123-24 (2004).

Generally, a deliberating juror can be excused only for reasons

personal to the individual juror, those that "do[] not pose a

threat to the integrity or independence of the deliberative

process." Id. at 124; See also State v. Ross, 218 N.J. 130, 147

(2014).

 Here, juror two's note did not set forth a valid basis for

the court to question or remove the juror. The note did not claim

there was "an inherently coercive and chaotic environment[, rising

to the level of] an affront to any notion of civilized justice,"

Dorsainvil, supra, 435 N.J. at 482, rather the juror only noted

there was a disagreement regarding the deliberative process. The

request for removal was also not supported by a reason wholly

personal to juror two, as such there was no basis to remove him.

 Turning to defendant's argument that the court should have

recharged on reasonable doubt, juror two's statement that "[w]e

have a juror who almost needs certainty," demonstrated that the

other juror understood the difference between proof beyond a

 13 A-4358-14T2
reasonable doubt as compared to proof by a preponderance of the

evidence, which was consistent with the court's original charge.

Moreover, the jury did not indicate any issue regarding its

understanding of any charge. The single juror's complaint about

a dispute in deliberations was not a substitute for a jury's

request for more information about a charge.

 In any event, after the court's instructions and the jurors'

decision to continue their deliberations into the evening, they

reached a verdict with no evidence of further conflict. Defendant

has not demonstrated the continuation of deliberations, any

alleged conflict between the two jurors or the failure to charge

reasonable doubt caused any prejudice. Defendant was acquitted

of the most serious charge against him and convicted of the lesser-

included offense, which demonstrated the jury's ability to

understand the law as charged.

 We turn next to defendant's contention that comments made by

the prosecutor during summations were improper. Again, we

disagree.

 Before the prosecutor presented his summation, defense

counsel attacked Masino's credibility during summations by calling

him a "sociopath." Over the State's objection, the trial court

permitted defense counsel to continue with the proviso that "he

make it clear [to the jury] that the[y] are [defense counsel's]

 14 A-4358-14T2
terms," or his "contention." Defense counsel resumed his summation

regarding Masino, stating: "As I was saying, he is a sociopath.

Do you know what a sociopath is? It is my opinion on the evidence,

that's an antisocial personality. He's pathological. He's a

pathological liar."

 During the prosecutor's summation, he stated:

 And that brings us to [defendant].
 Again, although [defendant's] closing was two
 hours long, we didn't hear much about what
 [defendant] said from this witness stand. We
 heard him referred to as a boy. We heard all
 of that information.

 If there is one pathological liar in this
 whole case, it's [defendant].

The prosecutor continued by arguing how the evidence supported

this characterization of defendant, referring to the fact

defendant admitted that he told police officers twenty-five lies

during their questioning of him. The prosecutor also stated that

Oscar was not familiar with the victim.

 Citing State v. Frost, 158 N.J. 76, 88-89 (1999), defendant

asserts that the prosecutor's reference to defendant as a

pathological liar was improper. He similarly contends that a

reference to Oscar not knowing Hernandez was "prohibited" and

unsupported by the record. Defendant argues these comments

prejudiced him by unfairly attacking his credibility and

"warrant[] a new trial." We find no merit to his arguments.

 15 A-4358-14T2
 At the outset, we observe that defendant did not object to

the prosecutor's summation. When a defendant fails to make a

contemporaneous objection to an argument presented during

summation, it is "fair to infer from the failure to object below

that in the context of the trial the error was actually of no

moment." State v. Ingram, 196 N.J. 23, 42 (2008) (quoting Nelson,

supra, 173 N.J. at 471); see also Frost, supra, 158 N.J. at 83

(holding generally, "if no objection was made [at trial,] the

remarks will not be deemed prejudicial)."

 When there is no objection made at trial, we review the record

for plain error. Plain error is "[a]ny error or omission [that]

is of such a nature as to have been clearly capable of producing

an unjust result." R. 2:10-2.

 Applying that standard, we conclude that there was no error

made by the trial court in permitting the prosecutor to comment

on defendant's credibility. When considering an argument about a

prosecutor's comments during summation, we must acknowledge that

"[p]rosecutors are expected to make a vigorous and forceful closing

argument to the jury, and are afforded considerable leeway in that

endeavor." Ingram, supra, 196 N.J. at 43 (quoting State v.

Jenewicz, 193 N.J. 440, 471 (2008)). "[S]o long as their comments

are reasonably related to the scope of the evidence presented" at

trial, courts afford prosecutors "considerable leeway" in the

 16 A-4358-14T2
vigor and force of the language used in closing arguments. State

v. Timmendequas, 161 N.J. 515, 587 (1999) (citing State v. Harris,

141 N.J. 525, 559 (1995)). "To justify reversal, the prosecutor's

conduct must have been 'clearly and unmistakably improper,' and

must have substantially prejudiced the defendant's fundamental

right to have a jury fairly evaluate the merits of his [or her]

defense." Id. at 575 (citations omitted). That said, "there is

a fine line that separates forceful from impermissible closing

argument. . . . [A] prosecutor must refrain from improper methods

that result in wrongful conviction, and is obligated to use

legitimate means to bring about a just conviction." Ingram, supra,

196 N.J. at 43 (quoting Jenewicz, supra, 193 N.J. at 471).

 A prosecutor may not "offer a personal opinion of defendant's

veracity"; however, the prosecutor may make comments "based on

reasonable inferences drawn from the evidence presented during the

trial." State v. Morton, 155 N.J. 383, 457-58 (1998) (finding no

error when a prosecutor called defendant's testimony a "self-

serving pack of lies" because the prosecutor's statements were

"based on reasonable inferences drawn from the evidence presented

during the trial" (emphasis added)); see also State v. Bauman, 298

N.J. Super. 176, 208 (App. Div.), certif. denied, 150 N.J. 25

(1997) (finding "alleged improper remark[ was] clearly [a]

 17 A-4358-14T2
remark[] on the credibility of defendant's testimony and [was]

therefore unobjectionable").

 Here, the prosecutor's statements were made in response to

defense counsel's characterization of the State's witness as a

sociopath and pathological liar. More importantly, they were

based upon defendant's admission during cross examination that he

gave the police three different versions of events regarding the

murder and that his statement to police contained up to twenty-

five lies. Accordingly, the prosecutor's characterization was

well-grounded in the evidence and was not improper.6 The

prosecutor's statement that Oscar did not know the victim was also

not contrary to the evidence, and did not prejudice the defendant.

 Defendant's remaining challenge to his conviction rests upon

his claim that he received ineffective assistance from trial

counsel. He asserts numerous issues with counsel's performance

that he claims led to his wrongful conviction. According to

defendant, the record of the trial is sufficient for us to rely

6
 Defendant's reliance on Frost is misplaced. In Frost, the
prosecutor did not attack defendant's credibility based on
evidence in the trial record; rather, he attempted to bolster the
credibility of the police officers by suggesting they would not
lie due to the severe consequences that would follow if they were
caught. See Frost, supra, 158 N.J. at 85.

 18 A-4358-14T2
upon in determining whether trial counsel's alleged errors

prejudiced defendant.

 We disagree with defendant's assessment of the sufficiency

of the record before us. We adhere to our "general policy against

entertaining ineffective-assistance of counsel claims on direct

appeal because such claims involve allegations and evidence that

lie outside the trial record." State v. Castagna, 187 N.J. 293,

313 (2006) (quoting State v. Preciose, 129 N.J. 451, 460 (1992)).

Typically, a "defendant must develop a record at a hearing at

which counsel can explain the reasons for his conduct and inaction

and at which the trial judge can rule upon the claims including

the issue of prejudice." State v. Sparano, 249 N.J. Super. 411,

419 (App. Div. 1991) (citations omitted); see also State v.

McDonald, 211 N.J. 4, 30 (2012). Defendant can pursue his claims

in accordance with the Court's rules governing post-conviction

relief petitions. See R. 3:22-1 to -13.

 Finally, we consider defendant's challenge to his sentence.

At sentencing, the court found that aggravating factors three,

N.J.S.A. 2C:44-1(a)(3) ("risk that defendant will commit another"

crime), and nine, N.J.S.A. 2C:44-1(a)(9) (the need to deter),

applied to defendant, as did mitigating factor seven, N.J.S.A.

2C:44-1(b)(7) (no prior criminal history). It concluded that "the

aggravating factors of three and nine substantially preponderate

 19 A-4358-14T2
over . . . mitigating factor seven . . . [, giving] a fair amount

of weight on aggravating factor three, a substantial amount of

weight on aggravating factor nine, and . . . limited weight to

mitigating factor seven."

 In imposing consecutive sentences, the court applied the

Yarbough factors. State v. Yarbough, 100 N.J. 627 (1985), cert.

denied, 475 U.S. 1014, 106 S. Ct. 1193, 89 L. Ed. 2d 308 (1986).

The court observed defendant agreed with the State that the

sentence for hindering his own apprehension should be consecutive

to the sentences for the other charges. Defendant argued, however,

that the sentences for aggravated manslaughter and desecrating

human remains should be concurrent. The court disagreed, stating:

 The charge of aggravated manslaughter and
 desecrating and disturbing human remains, and
 hindering [his] own apprehension, look at and
 consider the factor of those crimes and their
 objects were predominantly independent of each
 other, although clearly you can argue that
 this was a particular episode. The aggravated
 manslaughter was distinct from desecrating
 human remains. No matter how you look at this,
 this crime took place in a garage in Fairview,
 New Jersey, but the body was then stuffed into
 a trunk and taken out and left in Lincoln Park,
 and left in a condition where it was pretty
 clear from the evidence that there was an
 intention to try to burn this car up. Motor
 oil had been spread all over. There was a
 discharged lighter found. Those are
 sufficiently independent, and although they
 occurred somewhat close in time, they are
 still independent.

 20 A-4358-14T2
 The court concluded by merging appropriate counts and

imposing a twenty-year term on the aggravated manslaughter charge,

subject to the mandatory period of parole ineligibility under the

No Early Release Act, N.J.S.A. 2C:43-7.2; a concurrent fifteen-

year term on the kidnapping charge; a consecutive seven-year term

on the charge of disturbing human remains; a three-year term on

the theft from person charge, concurrent to the aggravated

manslaughter sentence; and a three-year term on the hindering

apprehension charge, connected to both the kidnapping and

disturbing human remains charges.

 Defendant argues on appeal that the court erred in determining

the kidnapping, disturbing human remains and hindering

apprehension charges were "separate criminal episodes," and

therefore the court was not justified in imposing consecutive

sentences as to those counts. He specifically relies upon the

fact that "[o]nly minutes elapsed between the blows to the victim's

head that led to his death and the decision to stuff the corpse

into a trunk of a car and take it out to Lincoln Park for disposal."

 Our review of sentencing determinations is limited and

governed by the "clear abuse of discretion" standard. State v.

Roth, 95 N.J. 334, 363 (1984). We are bound to uphold the trial

court's sentence, even if we would have reached a different result,

"unless (1) the sentencing guidelines were violated; (2) the

 21 A-4358-14T2
aggravating and mitigating factors found . . . were not based upon

competent and credible evidence in the record; or (3) 'the

application of the guidelines to the facts . . . makes the sentence

clearly unreasonable so as to shock the judicial conscience.'"

State v. Fuentes, 217 N.J. 57, 70 (2014) (quoting Roth, supra, 95

N.J. at 364-65); see also State v. O'Donnell, 117 N.J. 210, 215-

16 (1989). Although sentences are reviewed for abuse of

discretion, the first prong of the analysis presents a question

of law that is reviewed de novo. State v. Robinson, 217 N.J. 594,

603-04 (2014).

 We conclude the court properly exercised its discretion in

sentencing defendant. The court considered and weighed the

sentencing factors, imposed consecutive sentences and explained

the reasons for its decision, including its qualitative

consideration of the Yarbough factors.7 See N.J.S.A. 2C:44-5(a);

7
 The factors that must be considered are as follows:

 (1) there can be no free crimes in a system
 for which the punishment shall fit the crime;

 (2) the reasons for imposing either a
 consecutive or concurrent sentence should be
 separately stated in the sentencing decision;

 (3) some reasons to be considered by the
 sentencing court should include facts relating
 to the crimes, including whether or not:

 22 A-4358-14T2
Yarbough, supra, 100 N.J. at 643-44; see also State v. Carey, 168

N.J. 413, 427-28 (2001). Contrary to defendant's argument,

concurrent sentences are not mandated even where the crimes were

connected by a 'unity of specific purpose', . . . were somewhat

 (a) the crimes and their objectives "were
 predominantly independent of each other;

 (b) the crimes involved separate acts of
 violence or threats of violence;

 (c) the crimes were committed at
 different times or separate places,
 rather than being committed so closely
 in time and place as to indicate a single
 period of aberrant behavior;

 (d) any of the crimes involved multiple
 victims;

 (e) the convictions for which the
 sentences are to be imposed are numerous;

 (4) there should be no double counting of
 aggravating factors;

 (5) successive terms for the same offense
 should not ordinarily be equal to the
 punishment for the first offense; and

 (6) there should be an overall outer limit on
 the cumulation of consecutive sentences for
 multiple offenses not to exceed the sum of the
 longest terms (including an extended term, if
 eligible) that could be imposed for the two
 most serious offenses.

 [Yarbough, supra, 100 N.J. at 643-44
 (footnotes omitted).]

 23 A-4358-14T2
interdependent of one another, and were committed within a short

period of time of one another." State v. Swint, 328 N.J. Super.

236, 264 (App. Div.) (emphasis added), certif. denied, 165 N.J.

492 (2000).

 Under these circumstances, we discern no reason to disturb

the sentences imposed. They were appropriately explained and do

not "shock the judicial conscience." State v. Case, 220 N.J. 49,

65 (2014) (quoting Roth, supra, 95 N.J. at 365).

 Affirmed.

 24 A-4358-14T2