**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2747-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ANTONY T. SHIELDS, a/k/a
ANTONY SHIELDS, JR.,

    Defendant-Appellant.

_____

Argued May 26, 2026 – Decided June 23, 2026

Before Judges Sabatino, Natali and Bergman.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 21-06-1508.

Margaret McLane, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Margaret McLane, of counsel and on the briefs).

John J. Santoliquido, Deputy Attorney General, argued the cause for respondent (Jennifer Davenport, Attorney General, attorney; John J. Santoliquido, of counsel and on the brief).

PER CURIAM

This case arises out of the fatal shooting of the victim, Alex Fernandez, after he had stopped his car to engage in a drug transaction and was attacked by two co-perpetrators, defendant Antony T. Shields and Jony Ramos. Tried by a jury, defendant was found guilty of felony murder, aggravated manslaughter, conspiracy, and attempted theft, but acquitted of robbery and other charges. The court imposed a sentence of fifty-five years, subject to the parole ineligibility terms mandated by the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2.

On appeal, defendant alleges various errors concerning the jury instructions, other-crimes evidence, expert testimony, and his sentencing. For the reasons that follow, we vacate the felony murder, conspiracy, and theft convictions due to materially flawed jury charges on concepts of attempt, but otherwise affirm his culpability. We also remand for resentencing.

I.

The State's proofs at trial included the following evidence.

The Killing of Alex Fernandez and its Immediate Aftermath

Fernandez's fiancée, Nadia Sanchez, testified that she and Fernandez had traveled in the early morning hours of February 4, 2021 to Camden from Philadelphia in the couple's black BMW. They did so after Fernandez had

A-2747-23

received an Instagram message from someone looking to buy marijuana from him. Through Instagram, Fernandez agreed to meet the buyer at an address on South 7th Street in Camden, a location suggested to Fernandez by the buyer.

The couple arrived at the designated location shortly before 2:00 a.m. According to Sanchez, a few minutes later, two men—a "light-skinned guy" and a "dark-skinned guy" with "dreads [or] braids," wearing a "black hoodie" and "a mask"—approached the BMW.

As recounted by Sanchez, while Fernandez remained in the driver's seat of their vehicle with the window rolled down, the two men asked Fernandez what type of marijuana he had brought with him. Fernandez went to show the men the small packages of marijuana he had for sale. As soon as he extended his hand out the car window, the "dark-skinned" man apparently moved to "snatch" the marijuana from him. Seemingly provoked by this sudden action, Fernandez put his vehicle into drive and began to rapidly pull away.

While Fernandez was attempting to drive away from the encounter, Sanchez testified that both the "light-skinned" and "dark-skinned" men drew guns, further stating that she saw at least the "dark-skinned" man fire at the

3

vehicle approximately four or five times.[1] Fernandez managed to get the BMW in motion but told Sanchez that he had been shot.

Fernandez soon thereafter lost consciousness and crashed the car into a parked vehicle less than a block away from where the shooting had occurred. Sanchez initially saw the shooters running towards the BMW as it had pulled away. However, they stopped their pursuit and disappeared after the BMW crashed.

Police officers from the Camden County Police Department arrived at the scene almost immediately after these events had transpired, having been alerted by the sound of gunfire as well as a gunshot detection system called "ShotSpotter." After being removed from the crashed BMW, Fernandez was put into a patrol car.

The police drove Fernandez to a nearby hospital, where he was ultimately pronounced dead, having succumbed to his injuries. Dr. Gerald Feigin conducted an autopsy at the hospital and found five gunshot wounds in Fernandez's body. The doctor concluded those injuries were the cause of his death.

---

[1] Ramos later testified that both he and defendant had individually fired at Fernandez, though he claimed defendant was the first to have done so.

A-2747-23

Police Investigation into Fernandez's Homicide

Law enforcement officers recovered four nine-millimeter shell casings at the scene of Fernandez's shooting. They also recovered three bullets that had been fired at Fernandez and his fiancée—one inside the BMW and two that were extracted from Fernandez's jaw and arm, respectively.

Fernandez's cell phone was also found in the crashed BMW and was subsequently searched by police. A search was carried out on Sanchez's cell phone as well. Additionally, video footage was obtained by law enforcement from surveillance cameras at an apartment complex located nearby on South 7th Street. The video depicted the two men coming up to the BMW, the firing of gunshots, and the BMW pulling away before crashing.[2]

After lawfully obtaining records for the Instagram account used to initiate contact with Fernandez, law enforcement officers soon discovered that the account had been accessed from four different IP addresses around the time of Fernandez's killing, two of which were in Camden. The owner of these IP addresses was later identified to be Sylvia Lopez, the mother of Ramos, who

---

[2] A portion of this surveillance footage was entered into evidence and played for the jury at trial. The video's admission into evidence and usage at trial is not a subject of dispute between the parties. We have reviewed the video as part of the appellate record.

resided on South 7th Street in Camden where both Ramos and defendant had been living.

Based on this cumulative information, both defendant and Ramos were identified as suspects in Fernandez's homicide. On March 11, 2021, police executed a valid search warrant at their shared residence on South 7th Street. Defendant and Ramos were found there and arrested.

Two different handguns were seized from the residence: (1) a Glock 26, which was found in a first-floor closet inside a shoebox that contained a Social Security card and a New Jersey identification card, both cards belonging to Ramos; and (2) a Polymer 80 gun found in the closet of an upstairs bedroom.[3]

The two handguns were tested by N.J. State Police Lieutenant Gwendolyn Tietjen, the head of the Department's ballistics unit. Both guns were found to be operable. Lieutenant Tietjen determined that two of the bullets—one that

---

[3] Though defendant himself did not testify at trial, one of the investigating officers, Detective Jeremy Jakowski, did testify as to the following when asked whether anyone had taken ownership of either of the firearms found in the residence: "So, two firearms are recover[ed]. One was found in the second floor of the residence. Information was passed to us that Mr. Shields had taken ownership of that firearm. The other firearm was found in a closet. So, essentially no one took ownership of that firearm." At closing arguments and as supported elsewhere in the record, defendant's ownership of the Polymer 80 was acknowledged by defense counsel, who noted that "the firearm my client took ownership in didn't match any form of ballistics." (Emphasis added).

A-2747-23

had been removed from Fernandez's left arm and the other found in the interior of the BMW—had been fired from the Glock 26. The Lieutenant additionally concluded that three of the four shell casings found at the scene of Fernandez's shooting had been discharged from the Glock 26.

Although Lieutenant Tietjen likewise examined the fourth shell casing and the bullet that had been removed from Fernandez's jaw, she concluded that neither had been discharged from either the Glock 26 or the Polymer 80. However, the Lieutenant was able to ascertain that the cumulative bullets and shell casings submitted for review had been discharged from two different firearms.

The defense at trial acknowledged that defendant was the owner of the Polymer 80 gun found upstairs, but denied that the Glock 26 belonged to him or that he had fired any shots at the scene.

Procedural History

On June 9, 2021, a Camden County Grand Jury returned an indictment, charging both defendant and Ramos with:

- First-degree robbery, N.J.S.A. 2C:15-1(a)(2) (count one);

- Second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:15-1(a)(2) (count two);

- First-degree felony murder, N.J.S.A. 2C:11-3(a)(3) (count three);

7

- First-degree purposeful or knowing murder, N.J.S.A. 2C:11-3(a)(1), (2) (count four);

- Second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count five); and

- Second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count six).

At some unspecified time before defendant's trial, Ramos reached a plea agreement with the State. Ramos pled guilty to aggravated manslaughter in exchange for a recommended sentence of seventeen years in prison, subject to NERA, in which 85% of that sentence would be served without parole. Ramos also agreed to testify as a prosecution witness at defendant's trial.

Before trial, the State moved under N.J.R.E. 404(b) to admit evidence of defendant's involvement in a separate robbery and shooting in Burlington County, arguing those prior bad acts were indicative of defendant's motive, intent, and a common plan or scheme in the present case. The trial court granted that motion, and evidence concerning the Burlington County offenses was thereafter admitted during this jury trial.[4]

---

[4] Defendant does not argue on appeal that the Burlington County evidence was erroneously admitted under Rule 404(b). However, as we will discuss in Part II(C), infra, he argues for the first time on appeal that, under N.J.R.E. 404(b), it was plain error for the court to allow evidence of the Polymer 80 gun to be presented to the jury.

A-2747-23

<u>The Jury Trial</u>

The case was tried by a jury over nine non-consecutive days in January 2024. Defendant did not testify on his own behalf, nor did he elicit testimony from any witnesses.

The State's proofs featured a surveillance video of the rapid encounter between Fernandez and the two men (whose faces were obscured) who ran to his vehicle, the firing of shots, and the car's crash after the wounded victim attempted to drive away. The State also presented incriminating testimony from Ramos, who explained how he and defendant had planned the encounter and what had ensued at the scene.

The State also presented testimony from Fernandez's fiancée Sanchez, who had been in the car with him; Dr. Feigin, who performed the autopsy on Fernandez; Lieutenant Teitjan, the aforementioned ballistics expert; and numerous law enforcement officers who had been involved in the investigation.

After the State rested, defendant moved for acquittal as to all six counts, arguing that there had been "insufficient evidence to prove beyond a reasonable doubt that [defendant] actually participated in the robbery, and subsequent murder." Defense counsel further noted that "[t]here's no direct evidence linking him to the crime scene. A firearm that he says was his, that he confessed to,

actually didn't match any of the bullets recovered from the scene." The trial judge denied the motion.

After three-and-a-half days of deliberations, the jury issued a mixed verdict on the various counts, as follows:

- As to count one, acquitting defendant of armed robbery and the lesser-included offense of robbery, but finding him guilty of the lesser-included offense of attempted theft;

- As to count two, finding defendant guilty of conspiracy to commit robbery;

- As to count three, finding defendant guilty of felony murder;

- As to count four, acquitting defendant of purposeful and knowing murder and the lesser-included offense of reckless manslaughter, but finding him guilty of the lesser-included offense of aggravated manslaughter;

- As to count five, acquitting defendant of unlawful possession of a weapon; and

- As to count six, acquitting defendant of possession of a weapon with purpose to use it unlawfully against the person of another.

Sentencing

The trial court sentenced defendant on April 19, 2024. Finding aggravating factors three, six, and nine under N.J.S.A. 2C:44-1(a) applicable, the court: (1) merged counts one and four with count three, sentencing defendant to fifty-five years in prison, subject to NERA, to run consecutively to

the eight-year prison term defendant was then serving for his robbery conviction arising out of Burlington County; and (2) sentenced defendant to seven years and six months in prison on count two, to be served concurrently with the sentences imposed on count three and on the Burlington County robbery conviction.

Appeal

In his briefs on this direct appeal, defendant presents the following arguments:

> POINT I
>
> THE FELONY MURDER CONVICTION MUST BE VACATED BECAUSE THE JURY EITHER BASED THE CONVICTION ON AN UNSUPPORTED PREDICATE FELONY OR RETURNED A LEGALLY INCONSISTENT VERDICT. (Not Raised Below).
>
>> A. The Court's Instructions Allowed The Jury To Convict Of Felony Murder Based On An Unsupported Offense.
>>
>> B. The Jury Could Not Validly Convict on Felony Murder While Acquitting on the Predicate Robbery.
>
> POINT II
>
> THE COURT'S IMPROPER INSTRUCTIONS ON ACCOMPLICE LIABILITY AND ATTEMPT

11

A-2747-23

REQUIRE REVERSAL OF DEFENDANT'S CONVICTIONS. (Not Raised Below).

A. The Court Gave The Wrong Accomplice Liability Instruction.

B. The Court Gave The Wrong Attempt Instruction.[5]

POINT III

THE IMPROPER ADMISSION OF OTHER-BAD ACT EVIDENCE REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS. (Not Raised Below).

POINT IV

THE IMPROPER ADMISSION OF A NET OPINION FROM THE BALLISTICS EXPERT REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS. (Not Raised Below).

POINT V

MULTIPLE SENTENCING ERRORS RENDER DEFENDANT'S 55-YEAR NERA SENTENCE EXCESSIVE.

---

[5] At oral argument, defense counsel clarified that defendant contends the flaw in the attempt charge also taints the guilty verdict on conspiracy in count two, although that point was not explicitly argued in his briefs.

A-2747-23

With respect to Points III (prior bad acts evidence) and IV (net opinion), defendant contends those alleged errors each require reversal of his convictions on all counts.

II.

We address the issues raised on appeal in a slightly different order and organization than that presented in the parties' briefs. We begin with the jury instructions concerning attempt.

A.

As a prelude to our analysis of the attempt instructions, we note several well-established principles. "It is fundamental that '[a]ppropriate and proper charges to a jury are essential for a fair trial.'" Velazquez v. Portadin, 163 N.J. 677, 688 (2000) (alteration in original) (quoting State v. Green, 86 N.J. 281, 287 (1981)); see also Washington v. Perez, 219 N.J. 338, 350 (2014) (noting that "[o]ur law has long recognized the critical importance of accurate and precise instructions to the jury"). "'A charge is a road map to guide the jury, and without an appropriate charge a jury can take a wrong turn in its deliberations . . . .'" Das v. Thani, 171 N.J. 518, 527 (2002) (quoting State v. Martin, 119 N.J. 2, 15 (1990)). The trial court has an "independent duty" to ensure that jurors receive accurate instructions on the law, "irrespective of the particular language

13

suggested by either party." State v. Reddish, 181 N.J. 553, 613 (2004) (citing State v. Thompson, 59 N.J. 396, 411 (1971)).

In evaluating on appeal whether an alleged flaw in a jury charge is consequential, we must consider the charge """as a whole.""" State v. McKinney, 223 N.J. 475, 494 (2015) (quoting State v. Jordan, 147 N.J. 409, 422 (1997) (quoting State v. Wilbely, 63 N.J. 420, 422 (1973))). We examine the entire charge to see whether it was ambiguous or whether it misinformed the jury about the law. State v. R.B., 183 N.J. 308, 324-25 (2005).

When, as is pertinent here, flaws in jury instructions are raised for the first time on appeal, we must determine whether those flaws amount to plain error. State v. Munafo, 222 N.J. 480, 488 (2015). Under that plain error standard, we must "consider whether [the] defendant's claim of error was 'clearly capable of producing an unjust result.'" Ibid. (quoting R. 2:10-2). In making that assessment, we bear in mind that "erroneous instructions on matters or issues material to the jury's deliberations are presumed to be reversible error." State v. Collier, 90 N.J. 117, 122-23 (1982). Charges providing incorrect or inadequate guidance to the jury are generally deemed "poor candidates for rehabilitation under [a] harmless error theory." State v. Weeks, 107 N.J. 396, 410 (1987); see also State v. Maloney, 216 N.J. 91, 105 (2013).

14

With these principles in mind, we turn to the trial court's instructions to the jury concerning attempt. Attempt was included in three counts of the indictment: attempted theft from the person (as a lesser included offense of armed robbery contained in count one); conspiracy to commit or attempt robbery (count two); and felony murder (count three). For each of those counts, the same basic concepts of criminal attempt under New Jersey law apply.

Under our Criminal Code, a person is guilty of an attempt to commit a crime if, "acting with the kind of culpability otherwise required for the commission of the crime," that person:

> (1) Purposely engages in conduct which would constitute the crime if the attendant circumstances were as a reasonable person would believe them to be;
>
> (2) When causing a particular result is an element of the crime, does or omits to do anything with the purpose of causing such result without further conduct on his part; or
>
> (3) Purposely does or omits to do anything which, under the circumstances as a reasonable person would believe them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.
>
> [N.J.S.A. 2C:5-1(a).]

The notion of attempt fundamentally involves a purposive offense that has not been fully completed, or which has been completed but for attendant

15

circumstances did not coincide with an actor's reasonable belief. See State v. Jones, 242 N.J. 156, 169 (2020). The proven purpose must be to cause a particular result. State v. Perez, 177 N.J. 540, 554 (2003).

In State v. Condon, 391 N.J. Super. 609, 617 (App. Div. 2007), we held that "when [a] defendant fails to complete the criminal act under [N.J.S.A. 2C:5-1(a)(1)] . . . [the defendant] may only be charged under [N.J.S.A. 2C:5-1(a)(3)]." (Emphasis added). Instructing a jury on an improper theory of attempt can constitute reversible error. Id. at 617-18.

For each of the three counts noted above, the State's contention of attempt encompassed subsection (a)(3) of the statutory definition, which entails "an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." N.J.S.A. 2C:5-1(a)(3) (emphasis added). Subsection (b) of N.J.S.A. 2C:5-1 further instructs that "[c]onduct shall not be held to constitute a substantial step . . . unless it is strongly corroborative of the actor's criminal purpose." N.J.S.A. 2C:5-1(b) (emphasis added).

As to count one ("attempted theft"), the State charged defendant with a purposeful, but uncompleted, commission of a theft upon Fernandez. As to the conspiracy charged in count two, the State alleged that defendant agreed to commit an armed robbery or robbery or, alternatively, "did agree to aid another

person(s) in the planning or commission of such crime(s) <u>or of an attempt or solicitation to commit such crime(s)</u>." (Emphasis added). Lastly, as to count three charging felony murder, the State alleged that defendant caused the death of Fernandez "when acting . . . in the commission of, <u>or attempted commission of</u>, or <u>flight after committing or attempting to commit a crime of robbery</u>." (Emphasis added).

The State's establishment of defendant taking, via act or omission, a "substantial step" to advance each of these offenses is a critical element of attempt under subsection (a)(3). The element must be proven, of course, beyond a reasonable doubt. <u>In re Winship</u>, 397 U.S. 358, 364 (1970); N.J.S.A. 2C:1-13(a). In these (a)(3) contexts, a jury must be charged that it is required to find defendant engaged in a substantial step in order to convict of attempt. <u>State v. Gonzalez</u>, 318 N.J. Super. 527, 535-36 (App. Div. 1999).

The Model (Criminal) Jury Charges provide alternative instructions for attempt crimes, including one for "impossibility" attempts under N.J.S.A. 2C:5-1(a)(1) and another for "substantial step" attempts under N.J.S.A. 2C:5-1(a)(3). The latter charge reads, in relevant part, as follows:

> The law provides that a person is guilty of an attempt
> to commit a crime if the person:[]
>
>             . . . .

17

> Purposely does or omits to do anything which, under the circumstances as a reasonable person would believe them to be, is an act or omission constituting a substantial step in the course of conduct planned to culminate in his [or her] commission of the crime.
>
> [Model Jury Charges (Criminal), "Attempt (N.J.S.A. 2C:5-1)" (rev. June 15, 2019) (emphasis added).]

For reasons that are not clear to us, the trial court unfortunately omitted from the jury instructions the required "substantial step" language when it defined attempted theft to the jury. And when the concept of attempt was mentioned elsewhere in the jury charges concerning conspiracy and felony murder, the court did not explain the necessity of proof of a substantial step. Hence, the charge "as a whole" concerning attempt omitted this essential definition. McKinney, 223 N.J. at 494.

Commendably, the State has conceded that the guilty verdict on attempted theft must be vacated because of the "substantial step" omission. As we have noted above, our case law dictates that the omission is plain error and cannot be deemed harmless, even though counsel could and should have pointed out the omission to the judge when the charge was delivered. The jury was deprived of an essential signpost on the road. Martin, 119 N.J. at 15.

The State's concession does not, however, go far enough. The material consequence of the definitional omission extends likewise to the conspiracy and

18

felony murder counts. It is impossible to know whether the jury found defendant guilty of conspiracy to commit a robbery or merely to attempt one. In fact, the jury's acquittal of defendant on the charges of both armed robbery and robbery signals that the jurors were not persuaded that defendant took part in a completed robbery. Similarly, we cannot presume the jury convicted defendant of felony murder for a death occurring in the course of a completed robbery rather than an attempted one. Moreover, an offense of theft or attempted theft does not qualify as a predicate offense under the felony murder statute and case law. See N.J.S.A. 2C:11-3(a)(3); State v. Hill-White, 456 N.J. Super. 1, 19 (App. Div. 2018); see also Gonzalez, 318 N.J. Super. at 536 (noting that "theft or attempted theft from the person is not a predicate crime for felony murder" under N.J.S.A. 2C:11-3(a)(3)).

We are mindful that the video footage and the testimony of Ramos and Sanchez support the State's theory that defendant, acting with Ramos, had attempted to rob Fernandez when they approached his car. But that evidential support does not cure a critical defect in the jury instructions.

Consequently, we must vacate defendant's convictions on not only count one as agreed by the State, but also counts two and three as well, due to the pervasive impact of the erroneous jury instructions concerning attempt.

19

B.

We next consider the jury instructions the court provided on the homicide charges (count four), as to which the jury acquitted defendant of murder and reckless manslaughter, but found him guilty of the lesser included offense of aggravated manslaughter. On this issue, there was no attempt charged, so the lack of a "substantial step" instruction is irrelevant.[6] Instead, defendant argues the charge on accomplice liability was defective.

In considering this argument, we are guided by the same principles of appellate review we set forth in Part II(A). Because the accomplice liability charge issue was not raised below, we consider whether the alleged flaw was plain error and sufficiently harmful to invalidate the guilty verdict.

The basic concepts of accomplice liability relevant to our discussion are well established. Pursuant to N.J.S.A. 2C:2-6(c):

> A person is an accomplice of another person in the commission of an offense if:
>
> (1) With the purpose of promoting or facilitating the commission of the offense; [the defendant]:

---

[6] Notably, on the verdict form, the word "attempt" (or its variant) does not appear on the queries for the three alternative homicide charges, but does appear on the form corresponding to the counts for attempted theft, conspiracy, and felony murder.

A-2747-23

(a) Solicits such other person to commit it;

(b) Aids or agrees or attempts to aid such other person in planning or committing it; or

(c) Having a legal duty to prevent the commission of the offense, fails to make proper effort so to do; or

(2) [The defendant's] conduct is expressly declared by law to establish his complicity.

[N.J.S.A. 2C:2-6(c).]

For accomplice liability to attach, the State must prove that the underlying crime was actually committed. State v. Lassiter, 348 N.J. Super. 152, 162-63 (App. Div. 2002). Here, the State did not proceed on a theory of an attempt to shoot and kill the victim. Rather, the fatal shooting indisputably was "actually committ[ed]." Id. at 159.

The State's theme at trial was dominantly, if not consistently, that defendant was the principal perpetrator and that Ramos was an accomplice in the criminal undertaking. That alleged primary role of defendant was the gist of Ramos's testimony describing how the attack on the victim was planned. However, during the court's delivery of the jury charge, the prosecutor interrupted the judge and orally requested, sua sponte, that the court issue a

21

charge on accomplice liability. The court acceded to that request, without objection by defendant.

Our Model (Criminal) Jury Charges contain two versions of an instruction on accomplice liability. One version is to be given when a "defendant is charged as an accomplice and [the] jury does not receive instruction on lesser included charges." Model Jury Charges (Criminal), "Liability for Another's Conduct/Accomplice (N.J.S.A. 2C:2-6)" (rev. June 7, 2021) ("Charge # One"). A second version of the model instruction applies to situations where the "defendant is charged as [an] accomplice and [the] jury is instructed as to lesser included charges." Model Jury Charges (Criminal), "Liability for Another's Conduct/Accomplice (N.J.S.A. 2C:2-6)" (rev. June 7, 2021) ("Charge # Two").

A footnote to Charge # Two explains that it is "intended to address circumstances similar to those in State v. Bielkiewicz, 267 N.J. Super. 520, 533 (App. Div. 1993)." Bielkiewicz involved a situation in which the victim, a tow truck driver, was removing cars from a restaurant parking lot. Id. at 525. An altercation between the driver and a man named Pitts ensued. Ibid. The driver was winning the fight when defendant Bielkiewicz and another person intervened to assist Pitts. Ibid. The driver ran and Pitts shot him fatally in the back. Ibid.

Bielkiewicz was charged as an accomplice to the homicide. Id. at 526. The trial court failed to explain to the jury, however, that it could find that Bielkiewicz did not share the same state of mind as Pitts. Id. at 531-32. For instance, we noted that the jury might believe that Bielkiewicz intended to help Pitts win the fight, but did not share Pitts's alleged intent to cause death or serious bodily injury. Id. at 527.

We held in Bielkiewicz that the trial court committed reversible error by failing to instruct the jury about the possibility that the alleged accomplice might have a less culpable state of mind than the principal offender. Id. at 525. Our courts have subsequently directed that in appropriate cases, such a jury instruction (sometimes referred to as a "Bielkiewicz charge") should be provided. See State v. Ingram, 196 N.J. 23, 39-41 (2007) (reiterating the Bielkiewicz principle, but finding such a charge to be unnecessary in the case because the jury was properly charged about the defendant-accomplice's possible culpability for either the more serious offense or the lesser-included offenses); see also State v. Rue, 296 N.J. Super. 108, 115-16 (App. Div. 1996) (ruling that no Bielkiewicz charge was necessary in a situation in which the evidence showed that the defendant either "participated in the vicious beating of the victim" or, conversely, remained in a car and did not take part in the offense).

Here, the trial court provided, without objection, the "Charge # One" version of the model charge on accomplice liability. That version omits a <u>Bielkiewicz</u> instruction. We do not regard that omission as plain error or reversible, for several reasons.

First, as we have noted, the State generally portrayed defendant as the principal offender and Ramos as his accomplice, not vice-versa. The prosecutor's spontaneous request for an accomplice liability charge was an apparent afterthought, perhaps made out of an abundance of caution. Had the request not been made, we would not have found that it was required.

Second, the case was tried against defendant alone, without Ramos. The risks of juror confusion about their relative degrees of culpability were lessened.

Third, as in <u>Ingram</u>, the jury was given detailed instructions about each of the lesser included homicide offenses of which defendant could have been found guilty. The respective states of mind associated with those offenses were meticulously explained.

A-2747-23

All things considered, we discern no plain error in the omission of a Bielkiewicz instruction in this case. Hence, we affirm defendant's conviction of aggravated manslaughter.[7]

## C.

We next consider defendant's argument that the jury should not have been informed about the investigators' finding of the Polymer 80 gun in the upstairs bedroom closet of his shared residence with Ramos. Defendant argues the evidence of the "upstairs gun" violated the principles of N.J.R.E. 404(b), which limits the admission of proof of prior bad acts, and unduly prejudiced him. Because this argument was not raised below, we consider it through a prism of plain error.

As a preliminary matter on this point, the State first argues that Rule 404(b) standards do not pertain here because the upstairs gun comprised "intrinsic evidence" admissible under the more lenient criteria of N.J.R.E. 401 and N.J.R.E. 403. See State v. Rose, 206 N.J. 141, 177-78 (2011) (delineating the differences between intrinsic evidence and prior bad act evidence). We

---

[7] Relatedly, we reject defendant's contention that the verdicts were intolerably inconsistent. In essence, the jury appeared to have been unpersuaded about the robbery charges but persuaded about the homicide charges. Any alleged inconsistency in the verdicts does not mandate reversal in the circumstances presented. State v. Banko, 182 N.J. 44, 46 (2004).

reject that argument. The State's own ballistics expert confirmed the upstairs gun was not fired in the victim's fatal shooting, and that the bullets that killed him were fired from Ramos's gun. The evidence of the upstairs gun was not intrinsic to the crimes charged against defendant.

The State suggests that the upstairs gun was admissible to show the thoroughness of the police investigation, but the quality of an investigation is not an element of a criminal offense that must be proven beyond a reasonable doubt. See N.J.S.A. 2C:1-13. The evidence and proven facts may support guilt even where the State's investigation was less than ideal.

We next consider whether Rule 404(b) required the upstairs gun to be excluded from evidence. The analysis under the rule is guided by the multifactor test first articulated by our Supreme Court in State v. Cofield, 127 N.J. 328, 338 (1992), which are:

> 1. The evidence of the other crimes must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;[8]

---

[8] Note that the Supreme Court has held that the second prong of the Cofield formulation need not be applied in every case. See State v. Williams, 190 N.J. 114, 131-34 (2007).

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

See also State v. Seddens, ___ N.J. Super. ___ (App. Div. 2026) (slip op. at 34-35) (illuminating the Rule 404(b) analysis).

Applying the Cofield factors is challenging here because there was no motion practice before the trial court to specify and evaluate the State's possible justifications for admitting the gun for reasons other than showing defendant's character. One might posit that the upstairs gun could have been used to bolster defendant's alleged intent to commit a violent robbery upon the victim. But we are constrained in balancing, retrospectively, that hypothetical permissible use against the prejudice to defendant.

Even if the first three prongs of Cofield appear to be satisfied, the balancing required under prong four does not work in defendant's favor. Defendant was not unfairly prejudiced by the upstairs gun's admission. Specifically, defendant affirmatively used the upstairs gun evidence, and its lack of a ballistics match to the bullets and cartridges at the crime scene, as grounds to argue he was not culpable in the shooting. Indeed, the only questions defense counsel posed of the ballistics expert in his brief cross-examination were to

27

emphasis that the expert did not connect the upstairs gun to the shooting. Defense counsel additionally highlighted that point in his closing argument. Hence, any Rule 404(b) violation was not "clearly capable of producing an unjust result." R. 2:10-2.

## D.

We briefly dispense with defendant's argument that the State's ballistics expert presented inadmissible "net opinions" in her trial testimony. See State v. Burney, 255 N.J. 1, 22-24 (2023) (articulating the net opinion doctrine). Having carefully examined the testimony, we are satisfied that the expert more than adequately provided the "whys and wherefores" for her opinions, within a reasonable degree of scientific certainty. See id. at 23.

## E.

Defendant's final arguments challenging his sentence on various grounds need not be resolved here. As a single point, we agree with defendant that the sentencing judge appears to have misstated the offenses he committed in Burlington County. Apart from that error, defendant must also be resentenced because we are vacating his convictions for conspiracy, felony murder, and attempted theft.

## F.

We have considered all other points raised on appeal, and they lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2).

Affirmed as to defendant's conviction of aggravated manslaughter; vacated as to the convictions of conspiracy, felony murder, and attempted theft. Remanded for a new trial and resentencing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-2747-23